# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2923

_____

Danny Alexander,                                              *
                                                             *
                    Appellee,                                *
                                                             *  Appeal from the United States
          v.                                                 *  District Court for the
                                                             *  Western District of Arkansas.
The Trane Company; American                                  *
Standard, Inc; American Standard                             *
Merged Hourly Pension Plan,                                  *
                                                             *
                    Appellants.                              *

_____

Submitted:   April 21, 2006
   Filed:   July 13, 2006

_____

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The Trane Co. (Trane), American Standard, Inc. (American Standard), and the American Standard Merged Hourly Pension Plan (pension plan) appeal the district court's judgment that the pension plan's administrator, the American Standard Pension Board (pension board), abused its discretion in denying Danny Alexander's claim for benefits under his qualified pension plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq*. We reverse.

# I.

In July of 1977, Alexander began working at Trane, a subsidiary of American Standard, as a shipping clerk. His essential job duties included preparing and loading equipment for shipment, operating powered material handling equipment, loading and staging trailers, and using powered hand tools and equipment. The job also required that he be able to stand and sit for four hours at a time, have use of all of his limbs, be able to lift forty-nine pounds, and be able to operate a forklift.

On April 17, 2001, Alexander sought treatment for vascular insufficiency and the swelling, pain, and chronic ulcerations in his legs. He was examined by Janina B. Bonwich, M.D., who noted that Alexander was fifty-one years old, was over six feet tall, weighed 420 pounds, and had a five-year history of discoloration in his pretibial skin. Dr. Bonwich observed that Alexander had dorsalis pedis and posterior tibial signals bilaterally, that both of his legs had some varicosities, and that it appeared as though anterior branches of his greater saphenous vein were dilated. Alexander also had pretibial swelling and ankle swelling. Dr. Bonwich determined that Alexander had venous insufficiency and had no history of deep vein thrombosis (DVT). She stated that he was "not in very bad shape" and thus did not need surgery. J.A. at 180. Dr. Bonwich concluded that if Alexander continued to wear his compression hose and elevate his legs, he would be fine. She also stated, however, that she wanted to fully assess his veins to determine if she needed to further treat his condition.

Alexander returned to Dr. Bonwich's office on April 23, 2001, for another examination. Dr. Bonwich observed that Alexander's right leg had a normal greater saphenous vein, but that he did have some varicosities. She determined that Alexander did not have DVT. Further, Dr. Bonwich observed that Alexander's deep system was also normal on the left but that he had some greater saphenous reflux in his left leg. She noted that he also had some partially thrombosed areas in his thigh and lower calf with some incompetent perforators at the ankle. Dr. Bonwich

concluded that Alexander had superficial thrombosis and incompetence of the greater saphenous vein, that his deep system was normal bilaterally, and that he had a normal saphenous vein system on the right.

On August 21, 2001, Dr. Bonwich again examined Alexander and concluded that he had severe venous insufficiency and no history of DVT. She observed that his symptoms were worsening—he was experiencing greater aches, pains and swelling, and was developing an ulcer that had not been there on his April 17th examination. Dr. Bonwich stated that Alexander's varicose veins and perforating veins were clearly causing his symptoms and that he would experience ulceration. She further stated that she believed that surgery might be beneficial and that Alexander would also benefit from a more experienced vein surgeon. She thus referred Alexander to John Eidt, M.D.

Dr. Eidt examined Alexander on September 4, 2001. He concluded that Alexander had severe venous insufficiency in his left leg, resulting in chronic venous stasis disease and ulceration. Dr. Eidt determined that surgery was not currently warranted, and he recommended elevation and a variety of compression dressings to bring Alexander's condition under control. Dr. Eidt further stated that Alexander "may have to be off work in order to get this to heal." J.A. at 186. Although Dr. Eidt indicated the need to reassess Alexander's improvement, he did not arrange for a specific follow-up appointment with him.

On September 27, 2001, Alexander returned to Dr. Bonwich's office, primarily to obtain a work release. Dr. Bonwich noted that Alexander's job involved some standing and concluded that he needed "to be off from work until he can either recover from this condition or maybe he will need to be off forever." J.A. at 188. She noted that Alexander had recently transitioned from driving a forklift at work to standing on a concrete floor, a change which Dr. Bonwich did not think would work well for him if he continued to suffer from ulcers, which she suspected he would.

On December 27, 2001, Alexander returned to Dr. Bonwich for a follow-up examination. Dr. Bonwich noted that Alexander's severe skin changes had previously had some preulcerative areas that had broken down to form some punctate ulcers and that this had concerned her. She now observed that because Alexander had been off of his feet, his preulcerative areas had healed and were significantly better.

On June 18, 2002, Alexander returned to Dr. Bonwich for another follow-up examination. Dr. Bonwich noted that Alexander had venous insufficiency and venous skin changes, varicose veins in his left anterior shin region, and continued swelling in his left leg while standing. She further noted that Alexander's use of his compression hose had helped, but that he would probably have to continue his off-work status to avoid developing an ulcer.

On or about June 25, 2002, Alexander submitted his application for disability pension benefits. Under the plan, a claimant is eligible for benefits only if he is "totally disabled from performing further work . . . , and in [American Standard's] opinion is likely to remain so disabled continuously and permanently." J.A. at 55. In support of his claim, Alexander submitted a medical application completed by Dr. Bonwich, in which she diagnosed him as suffering from varicose veins of the lower extremities, peripheral vascular disease, vascular insufficiency, and a history of venous ulcerations in the left leg. In response to the question of whether, if Alexander's condition was chronic, changes had occurred that caused him to be disabled for further work, Dr. Bonwich stated that Alexander continued to have leg swelling bilaterally after getting out of bed in the morning and that this swelling caused him pain throughout the day. In response to the question about Alexander's remaining physical and mental capacities, Dr. Bonwich noted that he needed time off from work for leg swelling, skin changes, and ulceration and noted that Alexander could not stand for more than thirty to sixty minutes.

After reviewing Alexander's file, Keith F. Holden, M.D., Medical Director for Trane's Unitary Products Group, determined that Alexander had failed to meet the medical eligibility requirements for a disability pension. Dr. Holden observed that Dr. Eidt had not recommended surgery or disability but had instead recommended conservative care. Dr. Holden also noted that, although Alexander's condition was improving, he had not yet returned to work. Trane's Human Resources Team Leader also reviewed Alexander's file, including Alexander's physical limitations as outlined by Dr. Bonwich in the medical application, and determined that there were suitable job placement opportunities at Trane within Alexander's remaining work capacities and for which he was reasonably suited by education, training, or experience.

On July 2, 2002, Trane notified Alexander that his application for pension benefits had been denied because he was not permanently incapacitated from performing further work. It also advised Alexander that he had a right to appeal this determination, and on July 30, 2002, Alexander submitted his written appeal.

After receiving Alexander's appeal, the pension board forwarded Alexander's file to the Reed Group, an independent medical review authority. The Reed Group's Vice President of Clinical Operations, Cecile Childrose, RN, conducted the initial review of Alexander's file and concluded that it did not support a determination that he was totally disabled from performing any further work. She noted that there was no documentation that Alexander had experienced blood clots or thrombophlebitis; that in April 2001, Dr. Bonwich had found only superficial thrombosis and that Alexander's deep system was normal bilaterally and with adequate blood flow; that Dr. Bonwich had determined that surgery was unnecessary; that by December 2001, Alexander's ulcerations were healing; that Alexander had a recent job change from driving a forklift to standing on a concrete floor; and that Alexander's ongoing plan for care involved only office visits every six months. The Reed Group's Medical Director, James C. Leyhane, M.D., also reviewed Alexander's file and similarly

concluded that the file did not support a determination that Alexander was totally and permanently disabled for all occupations.

On September 13, 2002, the pension board notified Alexander that it had denied his appeal because, in its opinion, his condition would not render him totally disabled from performing further work for the remainder of his life.

Alexander then brought this action against American Standard, Trane, and the pension plan under ERISA, arguing that the pension board had abused its discretion in denying him pension benefits. The district court determined that, "[a]lthough Plaintiff's treating physicians were not in lock step in any recommendation that Plaintiff be off work 'continuously and permanently,' the practical implications of their review reflect this to be the bottom line." D. Ct. Order of June 2, 2005, at 19-20. It also noted that, although Trane's Human Resources Team Leader had indicated that there were jobs available at Trane suited to Alexander's remaining work capacities and for which he was reasonably fitted by education, training, or experience, she had indicated this with only a check mark and had failed to provide any evidence that alternative jobs were actually available. Accordingly, the district court concluded that the pension board had abused its discretion in denying disability pension benefits to Alexander and granted judgment in Alexander's favor.

## II.

The parties agree that an abuse of discretion standard of review applies in determining whether the pension board erroneously denied Alexander pension benefits. Under this standard, the pension board's decision need be only reasonable, meaning that it must be supported by substantial evidence. Jackson v. Metro. Life Ins. Co., 303 F.3d 884, 887 (8th Cir. 2002). A court is not to substitute its own judgment for that of the plan administrator. Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 807 (8th Cir. 2002). We review *de novo* the district court's application of this

standard, <u>Norris v. Citibank, N.A. Disability Plan (501)</u>, 308 F.3d 880, 884 (8th Cir. 2002), and we will reverse the pension board's decision only if it was arbitrary and capricious, <u>Groves v. Metro. Life Ins. Co.</u>, 438 F.3d 872, 874 (8th Cir. 2006).

The terms of the pension plan provide that Alexander must be totally and permanently disabled to be eligible for benefits. We conclude that substantial evidence supported the pension board's determination that this standard was not met. The reviewing physicians concluded that Alexander was not totally and permanently disabled. Further, the conclusions of Alexander's treating physicians fail to conclusively support his claim that he is totally and permanently disabled. As recounted above, Dr. Bonwich observed that Alexander's condition had improved considerably after Alexander had taken time off of work, and she indicated that there was only a possibility that Alexander would have to continue his off-work status indefinitely. Similarly, Dr. Eidt concluded that surgery was unnecessary to treat Alexander's condition and stated that Alexander might have to maintain his off-work status to allow his ulcers to heal. These treating physicians' conclusions demonstrate that there was only a possibility of permanent disability. In light of this ambivalence, the plan administrator's decision to deny Alexander benefits was reasonable. Even if Alexander's treating physicians' conclusions had supported his claim, the pension board was within its rights in relying on the reviewing physicians' conclusions because, as <u>Black & Decker Disability Plan v. Nord</u> made clear, plan administrators need not accord special weight to treating physicians' opinions. 538 U.S. 822, 828, 834 (2003) (overruling <u>Donaho v. FMC Corp.</u>, 74 F.3d 894 (8th Cir. 1996)); <u>see also</u> <u>McGee v. Reliance Standard Life Ins. Co.</u>, 360 F.3d 921, 925 (8th Cir. 2004).

The judgment is reversed, and the case is remanded to the district court for entry of judgment in accordance with this opinion.

———————————————————