Jean TORGESON, Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA and Mason City Clinic, P.C., Defendants.

No. C 05–3052–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Dec. 6, 2006.

Kevin J. Visser, Moyer & Bergman, PLC, Cedar Rapids, IA, Mark D. Debofsky, Daley, Debofsky & Bryant, Chicago, IL, for Plaintiff.

Debra Lynne Hulett, Michael W. Thrall, Nyemaster Goode West Hansell & O'Brien, PC, Des Moines, IA, for Defendants.

**MEMORANDUM OPINION AND OR-
DER ON THE MERITS UPON
SUBMISSION ON THE WRITTEN
RECORD**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................ 1101
 A. Procedural Background ............................................ 1101
 B. Factual Background ............................................... 1102
 1. Torgeson's employment .......................................... 1103
 2. The Plan ....................................................... 1103
 3. Torgeson's treatment history .................................... 1104
 a. Pain ........................................................ 1105
 b. Fatigue ..................................................... 1106
 c. Depression .................................................. 1107
 d. Work restrictions ........................................... 1109
 4. Torgeson's attempts to obtain LTD benefits ...................... 1111
 a. Application ................................................. 1111
 b. Initial review and denial ................................... 1111
 c. Appeal and further review .................................. 1113

II. LEGAL ANALYSIS ............................................. 1119
 A. What Standard Of Review Applies? ................................ 1119
 1. Arguments of the parties ........................................ 1119

2. Analysis ................................................................... 1121
 a. Conflict of interest ........................................... 1121
 b. Procedural irregularities ................................... 1122
B. The Applicable Standard Of Review ................................. 1124
C. Application Of The Standard ........................................ 1124
 1. Arguments of the parties ...................................... 1124
 a. Torgeson's initial arguments ............................ 1124
 b. Unum's response ......................................... 1125
 c. Torgeson's reply ........................................ 1126
 2. Discussion ..................................................... 1126
 a. Improper reliance on a lack of objective evidence ................ 1126
 b. Improper rejection of treating physicians' opinions .............. 1131
 c. Failure to consider co-morbidity ............................. 1133
 d. Failure to find "disability" ................................ 1134
D. The Appropriate Remedy ............................................ 1137
 1. Remand or award of benefits? ................................. 1137
 2. Prejudgment interest .......................................... 1137
 3. Attorney fees ................................................. 1138

III. CONCLUSION ....................................................... 1139

Was a claimant with a string of purported maladies, including fibromyalgia, chronic pain syndrome, chronic fatigue syndrome, depression, and migraine headaches, sufficiently "disabled" to receive benefits under a long-term disability benefits plan governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.?* That is the question posed in this action for judicial review, pursuant to 29 U.S.C. § 1132(a)(1)(B), of an insurer's denial of benefits. The claimant contends, in essence, that there was no reasonable basis to dispute that she suffered from all of her purported maladies, that the co-morbidity of those maladies plainly made her "disabled" within the meaning of the long-term disability insurance plan, and that all of her treating physicians agreed that she was "disabled." Thus, she contends that the insurer abused its discretion—if, indeed, the insurer is entitled to "abuse of discretion" rather than "less deferential" review—when the insurer denied her application for benefits. The insurer contends, however, that it did not abuse its discretion by concluding that the medical records submitted by the claimant did *not* support the claimant's claim of a "disability," even though the medical records *did* support some of her claimed maladies. The insurer contends that the record shows that the claimant went "shopping" for a physician who would give her the work limitations that she demanded after all of her other treating physicians had refused to do so.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Jean Torgeson, a former "office nurse" with Mason City Clinic, P.C. (MCC), filed this ERISA judicial review action pursuant to 29 U.S.C. § 1132(a)(1)(B) on August 30, 2005, seeking restoration of disability income benefit payments pursuant to a long-term disability (LTD) policy of insurance underwritten by Unum Life Insurance Company of America (Unum) in which employees of MCC were able to participate. *See* Complaint (docket no. 6). Torgeson named as defendants both MCC and Unum. Torgeson identified as the basis for her claim for LTD benefits her increasing pain from fibromyalgia, migraine headaches, chronic fatigue, and depression secondary to her chronic pain. On October 18, 2005, Unum

filed an Answer (docket no. 11) to Torgeson's Complaint denying that Torgeson is entitled to benefits. The parties eventually stipulated to the dismissal of MCC from this litigation, although MCC had never answered Torgeson's Complaint. *See* Stipulation Of Dismissal, April 11, 2006 (docket no. 21).

On January 13, 2006, the court entered a Scheduling Order (docket no. 12), which provided, in pertinent part, that this case would be submitted on a written record and briefs on the merits pursuant to a schedule set out in the order. Notwithstanding the terms of the Scheduling Order, the parties failed to submit the written record upon which determination of the case was to be made by the February 15, 2006, deadline, and notwithstanding that no dispositive motions had been contemplated in the Scheduling Order, Torgeson filed a Motion For Summary Judgment (docket no. 13) on March 31, 2006. By order dated April 3, 2006 (docket no. 15), the court *sua sponte* struck Torgeson's Motion For Summary Judgment, because that motion did not comply with the terms of the Scheduling Order. The order striking Torgeson's Motion For Summary Judgment also set a revised schedule for submission of the case on a written record and briefs, although the court amended that schedule somewhat to correct the deadlines in another order filed April 4, 2006 (docket no. 16). Pursuant to the revised schedule for submission of the case, Unum filed the administrative record on April 13, 2006 (docket no. 22). However, on May 1, 2006, the deadline for submission of her brief on the merits, instead of filing such a brief, Torgeson unaccountably filed *another* Motion For Summary

Judgment (docket no. 26). By order dated May 2, 2006 (docket no. 28), the court again *sua sponte* struck Torgeson's second Motion For Summary Judgment, because that motion did not comply with either the original or revised schedule for submission of the case on a written record and briefs. In that order, the court also established a second revised schedule for submission of the case on a written record and briefs, prohibited Torgeson from filing any further dispositive motions in this case, and prohibited the parties from filing any other motions in the case except upon leave of the court.

Being able to take a hint when hit over the head with one, the parties finally submitted the case on the written record and briefs, as originally contemplated in the January 13, 2006, Scheduling Order, pursuant to the revised briefing schedule and subsequent extensions: Torgeson filed her opening brief on the merits (docket no. 29) on May 8, 2006; Unum filed its response (docket no. 34) on July 24, 2006; and Torgeson filed a reply (docket no. 35) on August 17, 2006. With the filing of Torgeson's reply, this matter was fully submitted on the merits.[1] Unfortunately, in addition to the delays occasioned by Torgeson's failure to comply with the original scheduling order, the press of other business has kept the court from resolving this matter in as timely a manner as the court would have liked.

### B. Factual Background

The record submitted provides the following factual background. The court will reserve essential findings of fact, however, for its legal analysis.

---

1. On November 27, 2006, Torgeson filed a Motion For Leave To Supplement The Record (docket no. 36). In that motion, Torgeson seeks leave to supplement the record with a favorable decision of the Social Security Administration on her application for Social Security disability benefits from July 28, 2004. The court finds that the motion to supplement the record is mooted by the determinations herein.

### 1. Torgeson's employment

Jean Torgeson worked for MCC as an "office nurse" from October 1, 1985, until July 28, 2004, when she ceased working owing to health problems allegedly consisting of fibromyalgia, chronic pain syndrome, chronic fatigue syndrome, migraine headaches, and depression. Prior to the onset of these conditions, Torgeson had survived lymphoma and, indeed, had continued to work through the chemotherapy prescribed to treat her cancer. Torgeson's lymphoma had been in remission for almost six years at the time of the events at issue here. Torgeson and her employer attempted to accommodate her limitations from pain, fatigue, migraines, and depression by reducing her work hours, as ordered by her physicians, and by assigning her to a less-demanding "float" nursing position, instead of her prior position in plastic surgery.[2] Unfortunately, Torgeson was eventually forced to quit her job as a nurse. Thereafter, she was only able to work between four and eight hours per week at a retail outlet.

### 2. The Plan

One of the employment benefits that Torgeson enjoyed as an employee of MCC was participation in an ERISA-governed Group Insurance Policy (the Plan) underwritten by Unum Life Insurance Company of America. The Plan, Administrative Record (docket no. 22), 132–72. The Plan included LTD benefits under certain conditions. Specifically, the LTD provisions of the Plan that are pertinent here are the following:

#### HOW DOES UNUM DEFINE DISABILITY?

* * *

**All Other Employees**

You are disabled when Unum determines that:

— you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

-you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

The loss of a professional or occupational license or certification does not, in itself, constitute disability. We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

#### HOW LONG MUST YOU BE DISABLED BEFORE YOU ARE ELIGIBLE TO RECEIVE BENEFITS?

* * *

**All Other Employees**

You must be continuously disabled through your **elimination period.** Unum will treat your disability as continuous if your disability stops for 30

---

**2.** Job descriptions for Torgeson's nursing positions at MCC are in the Administrative Record at 64–69. However, as explained below, a "regular occupation" is defined in the Plan in terms of how an occupation "is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." The Plan, Glossary, Administrative Record at 169. Therefore, the court has not quoted the specific descriptions for Torgeson's jobs with MCC in this decision.

days or less during the elimination period. The days that you are not disabled will not count toward your elimination period.

Your elimination period is 90 days.

*CAN YOU SATISFY YOUR ELIMINATION PERIOD IF YOU ARE WORKING?*

Yes. If you are working while you are disabled, the days you are disabled will count toward your elimination period.

The Plan, Administrative Record at 146–47 (emphasis in the original).[3] The Plan Glossary defines key terms, in bold in the Plan and as quoted above. *See id.* at 166–69. The definitions in the Plan of the key terms, in the order in which they appear above, are the following:

**LIMITED** means what you cannot or are unable to do.

**MATERIAL AND SUBSTANTIAL DUTIES** means duties that:

— are normally required for the performance of your regular occupation; and

— cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

**REGULAR OCCUPATION** means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

**SICKNESS** means an illness or disease. Disability must begin while you are covered under the plan.

**INJURY** means a bodily injury that is the direct result of an accident and not related to any other cause. Disability must begin while you are covered under the plan.

**INDEXED MONTHLY EARNINGS** means your monthly earnings adjusted on each anniversary of benefit payments by the lesser of 10% or the current annual percentage increase in the Consumer Price Index. Your indexed monthly earnings may increase or remain the same, but will never decrease.

The Consumer Price Index (CPI–W) is published by the U.S. Department of Labor. Unum reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI–W.

Indexing is only used to determine your percentage of lost earnings while you are disabled and working.

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income at least equal to your gross disability payment within 12 months of your return to work.

**ELIMINATION PERIOD** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum.

The Plan, Glossary, Administrative Record at 166–69.

#### 3. *Torgeson's treatment history*

Torgeson contends that she became "disabled" within the meaning of the Plan on September 19, 2003, the last day she

---

**3.** Because the amount of any benefits to which Torgeson may be entitled is not at issue in this judicial review action, the court has not included the provisions of the Plan explaining how much a disabled employee will be paid as LTD benefits. *See* The Plan, Administrative Record at 147.

worked full-time with any consistency, when her various conditions worsened to the point that she could no longer work or could no longer work full-time. The court finds that a more coherent picture of Torgeson's medical conditions and their impact on her ability to work can be developed "topically," rather than "chronologically." Thus, based on Torgeson's contention that she suffers from fibromyalgia, chronic fatigue syndrome, depression, and migraines,[4] which limited her ability to work, the court will discuss Torgeson's treatment history in terms of "pain," "fatigue," "depression," and "work restrictions."

Such a "topical" organization is appropriate, in part, because Torgeson saw a number of physicians, of different specializations and at different institutions, at various, often overlapping times. Thus, a chronological discussion of her treatment could be quite confusing. More specifically, Torgeson saw Dr. R. Bruce Trimble, a rheumatologist, Dr. Mark Johnson, and Physician's Assistant Lisa K. Hedrick with the Mercy Internal Medicine Clinic in Mason City, Iowa, at times relevant here from September 15, 2003, until March 30, 2004. In November 2003, Torgeson started seeing Dr. Melissa Frame, a gynecologist with the Mercy Women's Health Center in Mason City, Iowa, after a hiatus of approximately three years since Dr. Frame had

last treated her, and Dr. Frame remained her primary physician until July 2004. From 2003 to August 2004, Torgeson saw various doctors at the Mayo Clinic's Physical Medicine & Rehabilitation Clinic and the Area Medicine Clinic, including Drs. Mark Harold Winemiller, Shabena F. Pasha, and Teresa M. Cuddihy, as well as psychiatrist Jeffrey Rome, and psychologist D.E. Rohe (Ph.D.). From February to September 2004, Torgeson also saw Dr. Dale Armstrong, a psychiatrist with the Mason City Clinic. On July 30, 2004, Torgeson first saw Dr. Charles Caughlan, an internal medicine doctor with Lakeview Internal Medicine in West Des Moines, Iowa. Dr. Caughlan had known Torgeson for about twenty-five years, and it appears that Torgeson turned to him when she was dissatisfied with diagnoses, treatment, or restrictions from other physicians.

### a. Pain

Torgeson makes two complaints about chronic or serial pain which she contends worsened about and from the date that she contends that she became "disabled": fibromyalgia[5] and migraine headaches. There is no dispute—and on this record could be no dispute—that Torgeson suffers from fibromyalgia; indeed, all physicians, treating and reviewing, agree that Torgeson suffers from this condition, and Unum

---

4. Although Dr. Caughlan, one of Torgeson's treating physicians, identified chemotherapy for Torgeson's cancer as a possible cause of the fibromyalgia and fatigue that Torgeson later suffered, see Administrative Record at 375 (medical records from Dr. Caughlan), her treating oncologist, Dr. Walter Bate, opined on August 13, 2004, that her "recurrent symptomology" was not at all related to her lymphoma. Administrative Record at 368. Torgeson also does not assert that her disability is attributable to her lymphoma, so the court will not consider cancer as causing, or

as contributing directly to, any limitations at issue here.

5. Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites." STEDMAN'S MEDICAL DICTIONARY 671 (27th ed.2000).

concedes that Torgeson suffers from such a condition. The question is, to what extent is Torgeson's fibromyalgia limiting? The court will return to that question below, in its legal analysis, after surveying Torgeson's other medical conditions and the work restrictions that were imposed by her various physicians.

Turning to Torgeson's migraines, at least as they are pertinent here, Dr. Cuddihy of the Mayo Clinic Area Medicine Clinic prescribed treatments and medications for Torgeson's migraines in July of 2003. Administrative Record at 421. Dr. Johnson of the Mercy Internal Medicine Clinic in Mason City also noted "migraine headaches" among Torgeson's conditions on September 25, 2003. Administrative Record at 360. Dr. Frame indicated in her Attending Physician's Statement to Unum, dated August 5, 2004, that, among other things, Torgeson suffered from migraine headaches. Administrative Record at 28. Similarly, Dr. Trimble noted "headaches" among his diagnoses for Torgeson in his undated Attending Physician's Statement and in various medical notes. Administrative Record at 188 (physician's statement), 352 (medical note for January 8, 2004). Thus, the court finds that Torgeson did suffer from migraine headaches, and Unum has not argued to the contrary. The question, again, is whether Torgeson's migraines were disabling or contributed to a disability within the meaning of the Plan. The court will also consider that question in its legal analysis.

### b. Fatigue

Again, there is no dispute—and on this record could be no dispute—that Torgeson suffers from fatigue, even chronic fatigue. The question, however, is whether Torgeson's "fatigue" is simply "chronic," and secondary to other conditions from which she suffers, such as fibromyalgia and/or depression, or whether it is, instead, "chronic fatigue syndrome."

On September 15, 2003, PA Hedrick concluded after an examination that Torgeson was suffering "[f]atigue with a history of fibromyalgia" and focused on appropriate medications to help Torgeson sleep despite pain. Administrative Record at 362–63. Dr. Frame noted in medical records for an office visit and on November 5, 2003, that Torgeson reported "a lot of fatigue," Administrative Record at 47; on November 19, 2003, that Torgeson was suffering "fatigue due to fibromyalgia" and "tire[d] easily," Administrative Record at 45; on December 10, 2003, that Torgeson was suffering "fatigue and pain due to her fibromyalgia," Administrative Record at 43; on January 13, 2004, that Torgeson "complain[ed] primarily now of an overwhelming feeling of exhaustion," which Dr. Frame thought might be caused, at least in part, by a sleep disorder, Administrative Record at 41–40; on March 2, 2004, that Torgeson had raised the question of whether her persistent cough might be a symptom of "chronic fatigue," which she raised after "doing some reading," but Dr. Frame ultimately noted, under "fibromyalgia," that Torgeson was "unable to perform at her current level because of excessive fatigue and pain," Administrative Record at 39; and on July 29, 2004, that Torgeson had reported that her fatigue was "progressively worsening" with attempts to work more than three days a week. Administrative Record at 34.

The critical part of Dr. Frame's notes on the issue of fatigue, however, is the April 6, 2004, note. In that note, under "Subjective," Dr. Frame made the following observations:

Most of what they are working on [at the Physical Medicine and Rehabilitation Center at the Mayo Clinic] is aimed toward gradually re-integrating Jean

back into the work environment. Jean, herself, has been having some concerns about this. She feels as though she is dealing adequately with the pain of her fibromyalgia. She has lea[r]ned a lot through the pain program and feels as though she has made some lifestyle modifications that can accommodate this. Her main concern and problem is her overwhelming fatigue. She feels as though she just cannot force herself to do more than the bear [sic] minimum to get by. She is doubtful that this fatigue is going to resolve significantly and she is wondering how she is ever going to make it through working on a full time basis. Evidentially [sic], the goal of her working with the physicians at Mayo is to gradually get her back into full time work. Jean is very upset because she feels as though her main problem is exhaustion, fatigue, and not pain. She feels as though her condition is more closely allied with chronic fatigue syndrome. She believes that the treatment for chronic fatigue syndrome differs from that of fibromyalgia in that people with chronic fatigue syndrome probably need to do more resting than pushing themselves to action. She feels that this is an important distinction, but she feels as though the provider[s] that she has visited with do not understand this. She is wondering how she might be able to get to work with someone who can address this chronic fatigue issue.

Administrative Record at 37. In her "Assessment & Plan" in the April 6, 2004, note, Dr. Frame stated the following:

Chronic fatigue syndrome—I told Jean that I have no problem with using the title of chronic fatigue syndrome for her condition. However, I am not so sure the treatment plan would differ that much between chronic fatigue syndrome and fibromyalgia. I also do not claim to be an expert in this area. It sounds as

though she really needs to get involved with a provider who has a clinical interest and expertise in this are[a]. I told her while I am not in a position to put limits on how much she can or cannot work I would write to the Physical Medicine and Rehabilitation doctor that she sees at Mayo to reiterate her concern about this chronic fatigue condition vis-à-vis whether or not she should work full time. I will try to ask if there is someone on staff at Mayo who has a clinical interest in chronic fatigue and would it be possible for Jean to meet with that person. We will see if this nets any additional help for Jean. I told her that I could not promise much. She is agreeable with [this] plan. She is going to send me information from her most recent Mayo visit.

Administrative Record at 36. Dr. Winemiller at the Mayo Clinic responded to Dr. Frame's inquiry by reporting that there was no one at the Mayo Clinic with a specialty in chronic fatigue syndrome.

In contrast to Dr. Frame's uncertainty about the nature of Torgeson's fatigue problem, and admitted lack of expertise with "chronic fatigue syndrome," Dr. Caughlan diagnosed Torgeson as suffering from both fibromyalgia and "chronic fatigue syndrome" after only a single visit on July 30, 2004, see Administrative Record at 24 (attending physician's statement to insurer), and opined that Torgeson was "genuinely disabled." Id. at 375 (medical record). Indeed, he described Torgeson as having "classic, chronic fatigue syndrome in addition to her fibromyalgia," but did not elaborate on what symptoms established that "classic, chronic fatigue syndrome" was an appropriate diagnosis. Id.

### c. Depression

Just as there is no dispute—and on this record could be no dispute—that Torgeson

suffers from fibromyalgia, migraines, and fatigue, there is no dispute—and on this record could be no dispute—that Torgeson suffers from depression. Again, however, the question is whether Torgeson's "depression" is simply secondary to other conditions from which she suffers, such as fibromyalgia, or is, instead, a physiological or psychological disorder.

More specifically, Dr. Johnson noted a "possible mood disorder" among Torgeson's conditions on September 25, 2003. Administrative Record at 360. Similarly, on October 1, 2003, Dr. Trimble stated his "impression" to be that Torgeson was having a "[f]lare in fibromyalgia/depression." Administrative Record at 357. On January 8, 2004, Dr. Trimble opined that Torgeson's "[s]ituation [was] complicated by depression," but that he thought her psychological situation warranted more expert review, and set up a referral appointment with Dr. Armstrong. Administrative Record at 352. In his undated Attending Physician's Statement for Torgeson, Dr. Trimble also noted "depression" among his diagnoses. Administrative Record at 188. On November 5, 2003, Dr. Frame observed that Torgeson "does have depressive symptoms," but concluded that she did not have any indications of psychological dysfunctions, Administrative Record at 46–47, and on January 13, 2004, Dr. Frame noted that "depression may be part of the picture at th[at] time," as well as exhaustion and pain, Administrative Record at 41. Records from the Mayo Clinic's Pain Rehabilitation Center include frequent references to the extent to which Torgeson was "depressed," the extent to which her symptoms of depression appeared under control, and the mood stabilization medications that she was taking. Administrative Record at 225–328. More specifically, on February 11, 2004, Dr. Rome of the Mayo Clinic listed among his diagnoses of Torgeson's conditions "Depression NOS."

Administrative Record at 409. Dr. Rohe, Ph.D., concurred in a medical note from February 15, 2004, listing among his diagnoses "Depressive disorder NOS." Administrative Record at 413. On January 26, 2004, Dr. Christopher Stetten, Ph.D., performed a Psychological Assessment of Torgeson, in which he found that Torgeson's score on the Center for Epidemiologic Studies–Depression Scale indicated "minimal depressive symptoms," and he concluded that Torgeson "has some mild depressive symptoms and frustrations regarding her functioning in the face of chronic pain." Administrative Record at 332.

Dr. Dale Armstrong, a psychiatrist, saw Torgeson on several occasions from February to September 2004. Administrative Record at 379–82; see also id. at 822–24 (typed transcription by Torgeson of handwritten notes by Dr. Armstrong, with Dr. Armstrong's corrections and certification of accuracy). Dr. Armstrong noted various comments about the degree to which Torgeson believed that she was or was not depressed, noted symptoms, and tried various medications, but never stated in those records a specific diagnosis or probable diagnosis of a depressive or other mental disorder. Id.

On November 6, 2004, after Torgeson quit working for MCC, she was evaluated by a psychologist, Dr. Carroll D. Roland, for purposes of an independent examination in support of Torgeson's application for Social Security disability benefits. Dr. Roland noted that Torgeson "continues to deny significant depression," but that Torgeson scored a 21 on Beck's Depression Inventory II (BDI–II), which indicated "moderate depression." Administrative Record at 653–54. Dr. Roland concluded that Torgeson was "clinically depressed despite the use of Effexor 150 mg a.m.," adding on Axis I of her diagnosis that

Torgeson suffered from a "Major Depressive Disorder, single episode (DSM IV: 296.21)." *Id.* at 655.

Thus, the record supports the conclusion that Torgeson suffered from depressive symptoms, if not an actual psychological disorder, probably secondary to her fibromyalgia and fatigue, during the entire time at issue here.

### d. Work restrictions

There is a series of "return to work notes" in the Administrative Record, which the court will summarize here in chronological order. On September 18, 2003, PA Hedrick, an assistant to Dr. Trimble at the Mercy Internal Medicine Clinic, took Torgeson off work for two to four weeks, because of "increased pain from fibromyalgia, extreme fatigue, chest wall pain, memory and concentration problems, arthralgia, migraine, and exercise intolerance." Administrative Record at 80. On October 1, 2003, Dr. Trimble authorized Torgeson to return to work on October 13, 2003, three days a week (Monday, Wednesday, and Friday) for two weeks, with the intent that, thereafter, she would gradually return to full-time work "as tolerated." Administrative Record at 81. On October 30, 2003, Dr. Trimble *post hoc* authorized Torgeson's return to "unrestricted full time work 10–27–03." Administrative Record at 82. On December 10, 2003, however, Dr. Frame of the Mercy Women's Health Center in Mason City, Iowa, restricted Torgeson to three days of work per week "as tolerated," "until further notice," because of "exacerbat[ion]" of her "chronic illness (fibromyalgia)." Administrative Record at 83. On February 13, 2004, Dr. Trimble authorized Torgeson to return to work Monday, Wednesday, and Friday, but required mid-morning and mid-afternoon breaks. Administrative Record at 84. Dr. Trimble modified those restrictions on March 15, 2004, to allow work three days a week for eight hours a day, adding that Torgeson "[s]hould stand no more than 4 h in an 8 h day [and][s]hould have regularly scheduled 15″ breaks mid am + mid pm, in add'n to lunch break." Administrative Record at 85. On March 25, 2004, Dr. Winemiller of the Mayo Clinic authorized Torgeson to return to work "part-time" on March 26, 2004, adding that Torgeson could work "[t]hree days per week (only), [with] [n]o more than 4° standing per 8° shift, 5–10 min sitting (at least) per hour, 1 minute stretch breaks up to 4x/hour, [r]egularly scheduled am/p.m. & lunch breaks, [and][a]lternation of tasks & activities during work shifts," and noted that these restrictions were "[g]ood through next visit with [him] in 2 months." Administrative Record at 86. On May 25, 2004, Dr. Winemiller authorized Torgeson to work eight-hour shifts three days per week, plus one five-hour shift, and beginning on May 26, 2004, two five-hour shifts, in addition to the three eight-hour shifts, adding that "[n]o more than 4° standing per shift, [with] one minute stretch breaks 4×/hour, [and] 3 scheduled breaks per day." Administrative Record at 87.

Soon thereafter, Torgeson was excused from all work. Specifically, on July 28, 2004, Dr. Kathryn Stolp of the Mayo Clinic excused Torgeson from work from that date to August 4, 2004. Administrative Record at 88.[6] On August 4, 2004, Dr. Winemiller, also of the Mayo Clinic, submitted a work status report stating that

---

**6.** Although Dr. Frame observed in a treatment note from July 29, 2004, that Torgeson was requesting reduction in her permitted work schedule from three full days with one or two additional five-hour shifts back to three days per week, the record does not indicate whether Dr. Frame ordered such a reduction. Administrative Record at 34.

Torgeson was unable to work from August 4, 2004, to August 13, 2004, and that "[f]urther work restrictions/releases to be filled out by her new lead physician." Administrative Record at 89. In clinical notes, however, Dr. Winemiller explained that he was concerned that Torgeson would suffer a "functional decline" if she was completely off work, but when she "implored" him by telephone to write a new set of work restrictions, he did so through August 13, 2004. Administrative Record at 401. In a clinical note from August 2, 2004, Dr. Winemiller also observed that Torgeson had not appeared for a scheduled appointment and that he would wait to see if she wanted to proceed further, adding that he was her second or third opinion, when local doctors were unwilling to write for long-term work restrictions that she was seeking. Administrative Record at 403. The new "lead physician" to whom Dr. Winemiller referred appears to have been Dr. Caughlan, who had actually provided Torgeson with a doctor's note on July 30, 2004, stating that, in his opinion, Torgeson was "temporarily unable to work for medical reasons," and that, "at some point in the future she may be able to return to work." Administrative Record at 90. Torgeson never returned to work at MCC after July 28, 2004.

Notwithstanding Torgeson's various doctors' notes limiting her work schedule, Dr. Frame indicated in her Attending Physician's Statement to Unum, dated August 5, 2004, that "I am not so sure that there is anything that this patient should not do," although she also noted that Torgeson herself "report[ed] having difficulty sitting or standing for prolonged periods of time," that Torgeson "report[ed] having memory problems," and that these restrictions and limitations began "approximately August 6, 2003." Administrative Record at 28. Dr. Trimble did find in his undated Attending Physician's Statement that various

restrictions and limitations were appropriate, and, for example, as of February 13, 2004, he released Torgeson only to work part-time in her own occupation, with limitations to eight-hour shifts on Monday, Wednesday, and Friday, brief mid-morning and mid-afternoon breaks, no heavy lifting, and no working long hours without rest. He also indicated that such restrictions and limitations began on August 6, 2003. Administrative Record at 188.

Notwithstanding these restrictions, Dr. Trimble commented on more than one occasion, in Torgeson's medical notes, that he had told Torgeson that people with fibromyalgia seem to do better if they work full time and that this would be his goal for her. *See* Administrative Record at 357 (October 1, 2003); *id.* at 352 (January 8, 2004). On July 16, 2004, Dr. Winemiller, likewise, stressed that returning to work full-time was his recommendation for fibromyalgia and that decisions of fibromyalgia patients not to return to work were made on a "personal basis," not on the basis of "medical necessity." Administrative Record at 436; *see also id.* at 439 (same recommendation March 25, 2004).

Like other physicians before him, Dr. Caughlan, who did not see Torgeson until July 30, 2006, stated in his undated Attending Physician's Statement, which was faxed to Unum on August 13, 2004, that Torgeson "can't stand for more than [1/2?] hr, [can't stand] for more than 4 hours during 8 hr shift, [must] rest for 10 min/hr, [and] must alternate tasks," and that these restrictions and limitations began August 6, 2003. Administrative Record at 24. In contrast to Dr. Trimble's and Dr. Winemiller's assessments, however, Dr. Caughlan also indicated that Torgeson was not released to work at that time at her own occupation or in any occupation, and that the point at which she could return to full- or part-time work was "indef[inite]." *Id.*

Somewhat like Dr. Armstrong, Dr. Roland, who performed the Social Security disability psychological evaluation, observed, "At this point in time, it is doubtful that she would be able to cope with the stress of full-time competitive employment secondary to her fatigue, depression and limited physical stamina." Administrative Record at 655.

### 4. Torgeson's attempts to obtain LTD benefits

#### a. Application

Shortly after her last day working for MCC, Torgeson filed on August 2, 2004, a claim for LTD benefits pursuant to the Plan. Administrative Record at 20. In her application, in answer to the question, "How does your injury or sickness impede your ability to do your occupational duties?" Torgeson answered, "Exhaustion, pain, migraines make it difficult to preform [sic] the duties of my job." *Id.* Her initial application, thus, did not indicate "depression" as a condition limiting her ability to work. Torgeson also did not indicate depression as a condition disabling her or contributing to her disability in an interview with an Unum Customer Care Representative on August 27, 2004, but did indicate that the date she first noticed the conditions was "mid 2003," and that the last day she worked before becoming disabled was September 19, 2003. Administrative Record at 183–84.

#### b. Initial review and denial

After assembling Torgeson's medical records then available (that is, records from Drs. Trimble, Johnson, Frame, Bate, Winemiller, Rome, Armstrong, and Caughlan), and the attending physician statements of Drs. Caughlan, Frame, and Trimble, Unum requested on October 12, 2004, that Jan Herbert, RN, conduct a Clinical Review. Unum asked Nurse Herbert to consider three questions and, if appropriate, forward the case file for further review by a physician. Administrative Record at 585–86. Nurse Herbert's analysis and conclusions, including her answers to the three questions posed, are set forth in full below:

**Analysis of Data and R & Ls [Restrictions & Limitations]**

Dr. Frame and Dr. Caughlan have submitted attending physician statements. Dr. Frame's dated 8/5/04. Dr. Caughlan's undated. Dr. Frame gives the insured no restrictions and indicates the limitations recorded were the result of the insured's assessment of her own capabilities. Dr. Caughlan has provided specific r/l, which are significantly confining, and reported to have begun 8/6/04. Hwr, according to the medical records available for review, insured was not in treatment with either of these physicians at the stated date of disability, 9/20/03. Dr. Frame indicated her first visit with insured was 11/5/03, and Dr. Caughlan has stated insured's first visit with him took place 7/30/04, 10 months after the reported date of disability. Physicians who were treating the insured in the period surrounding 9/20/03, indicated full time work was thought to be both reasonable, attainable, and in the insured's best interest. The clinical findings appear to be consistent with that position, endorsed by both Dr. Trimble and Dr. Winemiller. Assessments by physicians attending insured at the date of disability are likely to be more credible than conclusions expressed by physicians who examined the insured months later, without first hand knowledge of her physical condition in September 2003. Information in the medical records suggest[s] the insured reported

symptoms of generalized body aches and excessive fatigue as early as 2001; sought treatment from at least 7 physicians, 1 physician's assistant, and a psychiatrist, over a 3 year period, 2001 to 2004; and often requested specific work restrictions related to hours, days, and task assignment. I was unable to identify clinical evidence consistent with insured's report of symptoms and functional limitations in examination notes or independent observation. Though insured maintains she is physically incapable of meeting employment obligations, she clearly indicated to Dr. Winemiller her commitment to remaining an active participant in community and church activities. The medical records suggest insured was seeing several physicians concurrently and some of the events documented do not appear to be in proper sequence.

**Conclusions:**

In response to your questions:

1. [Do the medical records support the claimant's multiple medical conditions?] The medical records document insured's report of symptoms consistent with fibromyalgia syndrome and suggestive of chronic fatigue syndrome. Physical examinations noted tenderness in the expected fibromyalgia tender points but did not specify the number of positives vs negatives, or the areas of positive response. Positive ANA was reported by Dr. Caughlan, however, no laboratory studies could be found in support of that assertion. Insured's lymphoma was described as being in remission, her oncologist stating he did not attribute any of her August 2003 complaints to earlier disease and treatment. Thyroid deficiency is managed with replacement hormone. Independent clinical evidence of additional general medical conditions was not identified.

2. [Do the R & L's as given per Drs Caughlan, Frame, and Trimble appear consistent with the findings in the medical records?] The r/l provided by Drs. Frame and Caughlan could not be supported by their clinical findings as neither of them examined the insured at the date of disability. Dr. Trimble's records indicated insured was released 10/30/03 to return to work with no restrictions. On 1/8/04, he agreed to restrict insured to 3 days of work per week for a short term but did not see that restriction as a long term solution to insured's issues. Five days later, Dr. Frame wrote in her OV note, "I tend to agree with Dr. Trimble that she should try to push herself as much as possible." There is no conclusive clinical evidence to support the r/l.

3. [Does a change in the claimant's work schedule appear consistent with the findings in the medical records?] Changes in the insured's work hours appear to have taken place at her insistence and based on her reports of pain and fatigue. Insured appears to have been accommodated with part time hours and changes in areas of responsibility, without significant positive result. I found nothing in the clinical evidence to suggest a physiological impairment requiring change of hours.

4. [Please forward to Dr Smith for review, if appropriate.] As r/l[s] do not appear to be supported, forwarding to GM physician worklist for physician review assignment.

Administrative Record at 590–91 (emphasis in the original) (questions interpolated

from the request for clinical review, Administrative Record at 585–86).

The physician's review requested by Nurse Herbert was conducted by Dr. Tony D. Smith, a physician certified in family practice. Dr. Smith's review concluded with the following observations and answers to the same questions posed to Nurse Herbert:

**Based on a review of the records and with a reasonable degree of medical certainty, the current medical records support the following:**

Reported migraine headaches—documented as stable on Topamax.

Hypothyroidism—stable on Synthroid, latest TSH in normal range as of July 2004.

No documented testing, labs, or imaging studies to support the reported pain and fatigue at a level that would support the listed R & L's.

History of non-Hodgkin's lymphoma 6½ years in remission.

No cognitive or neuropsychiatric testing in the file.

Discrepancies and disagreements among the listed attending physicians as to the ability to work and what R & L's were needed if any.

No GI records or documentation of a functional deficit from IBS (irritable bowel syndrome).

Current psychiatric records do not document any significant functional impairment and no Psychiatrist completed an APS.

Current medical records do not document any significant change in physical exams or testing around the time Ms. Torgeson stopped working or when she went to 3 days a week.

**Answer to Questions:**

**Do the medical records support the claimant's multiple medical complaints?** Please see the above list and analysis.

**Do the R & L's as given per Drs Caughlan, Frame, and Trimble appear c/w the findings in the medical records?** No. Current medical records as discussed above do not document support for the listed R & L's.

**Does a change in the claimant's work schedule appear c/w the finding's [sic] in the medical records?** No. Current records do not document support for a reduced work schedule or the complete withdrawal from work.

Administrative Record at 603–04 (emphasis in the original).

Following these Clinical Reviews, Unum denied Torgeson's application for LTD benefits under the Plan by letter dated November 16, 2004. Administrative Record at 625–30. Unum's denial letter set out the definition of "disability" in the Plan, summarized the medical records, and reiterated Dr. Smith's statement of what the current records supported, then stated, "[B]ased on the above outlined reasons and the information currently contained in your claim file, we regret that we are unable to accept liability for your request for Long Term Disability benefits." *Id.* at 625–29. The remainder of the letter set out the procedures for appeal and further review of that decision. *Id.* at 629–30.

### c. Appeal and further review

By letter dated December 15, 2004, a law firm retained by Torgeson notified Unum of its representation of Torgeson and its "intent to appeal in relation to her claim for disability insurance benefits." Administrative Record at 639. That letter not only requested all of the documents that Unum had reviewed, but set out the anticipated grounds for Torgeson's appeal. Torgeson's attorneys submitted her appeal

proper by letter dated March 23, 2005, stating, *inter alia*, that they "completely disagree[d] with [Unum's] determination that Ms. Torgeson does not qualify for benefits for the reasons stated in prior communications (See: Letter of December 15, 2004) as well as for the reasons stated [in the March 23, 2005, letter]." Administrative Record at 659. The grounds for Torgeson's appeal set forth in considerably more detail in her March 23, 2005, letter than in the initial letter notifying Unum of Torgeson's intent to appeal were the following: over-reliance on the opinions of in-house physicians and failure to adequately consider the medical opinions of treating physicians; failure to consider the co-morbid effects of all of Torgeson's conditions; and too much emphasis on objective evidence, thereby disregarding disabling symptoms characteristic of fibromyalgia. *Id.* at 659–60. In addition, Torgeson's attorneys contended that Unum's decision violated the terms of a regulatory settlement agreement (RSA) following a market conduct investigation of UnumProvident Corporation and its subsidiaries and that Unum had, therefore, violated its fiduciary duties. *Id.* at 659.

Thereafter, Torgeson continued to submit to Unum more medical records that had not been available at the time of Unum's initial denial of Torgeson's claim. Those records included records from Dr. Trimble for a visit on September 30, 2004, Administrative Record at 743; office notes from Dr. Caughlan concerning visits on February 10, 2005, and March 9, 2005, Administrative Record at 689–90; Dr. Rolland's psychological evaluation, Administrative Record at 699–704; a letter from Dr. Frame dated February 4, 2006, offering explanations of some of her medical

notes, Administrative Record at 708 (incomplete) & 728–29 (complete); a mental impairment questionnaire completed by Dr. Armstrong on February 14, 2005, Administrative Record at 711–15, and other records from visits to Dr. Armstrong from July 2004 to February 2005, Administrative Record at 748–56. Torgeson also submitted to Unum other support for her claim, including a function report and a personal pain/fatigue questionnaire that she had submitted to the Social Security Administration on January 20, 2005; letters from her pastor, Administrative Record at 707, her mother, Administrative Record at 695–96, and the doctor who had supervised much of her work at MCC, Administrative Record at 693–94; and the decision of the Social Security Administration denying on reconsideration Torgeson's claim for disability insurance benefits, Administrative Record at 730–33.[7]

On May 11, 2005, Unum referred Torgeson's medical file for further medical review, indicating "CO–MORBID REV REQ" under "Priority Notes," and requesting answers to six questions. Administrative Record at 768–69. The first medical review on appeal was performed on May 23, 2005, by Kim Brothers, RN, BSN, ALHC, a senior clinical consultant for Unum. Administrative Record at 793–801. Nurse Brothers's answers to the six referral questions, including reiteration of the questions themselves, were as follows:

**REFERRAL QUESTIONS:**

1. Does the claim file reference any unavailable records of treatment that if obtained would provide you with a better understanding of the employee's clinical status?

 No, however Dr. Armstrong's records are primarily illegible though claimant

---

**7.** The letters from Torgeson's mother and supervising doctor at MCC are not in complete form in the administrative record submitted

by Unum, although Unum contends that the record contains the entirety of the letters that it actually received.

has typed her interpretation of records. Please obtain certification from Dr. Armstrong that interpretations are accurate and then return file for psych. review. Thank you.

2. Is the diagnosis of fibromyalgia supported?

Yes, diagnosis appears supported based on documentation noted above.

3. If so, please clarify the level of impairment associated therewith (prevents employee from standing, walking, sitting, lifting, how long/much etc).

It is difficult to assess claimant's level of functionality based on records in file. There appear to be differing opinions regarding claimant's functionality and associated restrictions. Therefore, I will defer to MD to determine her level of impairment, if any.

4. Does the data support the diagnosis of CFS [chronic fatigue syndrome]?

No, based on records in file the diagnosis of CFS does not appear to be supported. According to the CDC, in order to receive a diagnosis of chronic fatigue syndrome, a patient must satisfy two criteria:

1. Have severe chronic fatigue of six months or longer duration with other known medical conditions excluded by clinical diagnosis, and

2. Concurrently have four or more of the following symptoms: substantial impairment in short-term memory or concentration, sore throat, tender lymph nodes, muscle pain, multi-joint pain without swelling or redness, headaches of a new type, pattern or severity, unrefreshing sleep, and post-exertional malaise lasting more than 24 hours.

The symptoms must have persisted or recurred during six or more consecutive months of illness and must not have predated the fatigue.

Though she has complained of chronic fatigue there is no evidence of substantial impairment in short term memory, sore throat, tender lymph nodes, headaches of a new type, etc. Based on the criteria above, she does not appear to meet the criteria. However, I will defer to MD for further evaluation and comment.

5. Does the record support a loss of functional abilities due to either the diagnosis or treatment? Will defer to MD

6. Do you agree with the R & L's identified by Dr. Caughlin and [Dr.] Trimble? Will defer to MD

Questions to MD: please respond to questions posed by appeals specialist. Thank you.

**"I have reviewed all medical and clinical evidence provided to me by Company personnel bearing on the impairment(s) which I am by training and experience capable to assess."**

Administrative Record at 800–01.

Upon Nurse Brothers's referral of the file for further review by a medical doctor, Unum actually requested two independent medical reviews. The first such review was by Dr. Jay G. Kenik, of the Department of Internal Medicine, Division of Rheumatology, at Creighton University Medical Center. Dr. Kenik filed his report with Unum by letter dated June 3, 2005. Administrative Record at 833–39. In his report, Dr. Kenik first identified the records that he had reviewed and Torgeson's medical history. Administrative Record at 833–36. He then provided the

following analysis and answers to the referral questions:

**Analysis of the Medical Information**

This patient has been diagnosed with fibromyalgia dating back to 2001. The diagnosis is supported by symptoms of myalgias and arthralgias, poor quality of sleep with chronic fatigue, associated depression and cognitive disorders. Additional symptoms have included headaches described as migraines, irritable bowel and bladder, decreased libido and loss of sex drive. Standard blood tests have been otherwise unremarkable including a CBC showing mild leukopenia and SED rates. She had a documented positive ANA, however no other correlative features were identified. Additional labs including thyroid functions on therapy have been in the normal range as have her blood chemistry profiles.

**In reference to the referral questions**

1. The claim file does not reference any unavailable records that have if [sic] obtained would provide me with a better understanding of the claimant's clinical status.

2. The diagnosis of fibromyalgia is supported by the information in the medical record. This includes features of myalgias and arthralgias, chronic fatigue with associated poor quality of sleep, headaches, irritable bowel and bladder, as well as the identifications of tender points on exam. In addition the lack of objective inflammatory findings of swelling, warmth, or erythema along with normal sedimentation rates, support this condition.

3. Impairment as a result of fibromyalgia is purely based on subjective reports by the patient. Nothing organically prevents them from standing, walking, sitting, lifting, etc. The majority of patients with this condition remain productive. Many patients do find that repetitive activities especially with the arms extended out in front of them or over their heads do result in symptomatic exacerbations. In addition, repetitive lifting may also be found to be difficult. Patients with this condition may have difficulty with protracted sitting and standing and need to be given the opportunity for periods of rest as well as to get up and move around episodically throughout the day. While patients may have some discomfort with certain activities, it should be made clear that they are not causing themselves more injury. The great majority of physicians as well as those involved in this case agree that it is in the best interest of patients to remain productive in some capacity. I feel the guidelines established by Dr. Winemiller certainly are appropriate for this patient with the ultimate goal to return to work in full capacity.

4. The patient's current fatigue is that related to her underlying fibromyalgia and not associated with chronic fatigue syndrome as clearly defined. That condition as associated with Epstein Barr Virus should have chronic sore throats and lymphadenopathy along with documented fevers.

5. The record only supports a loss of functional ability based on the subjective reports by the patient. As I interpret the records, the consensus seems [to be] that she should be able to return to work under the guidelines as outlined

by Dr. Winemiller. Since 9/03, the only continuous duration, however would be during her hospitalization at the Mayo Clinic (three weeks). I am in agreement with the restrictions and limitations as outlined by Dr. Trimbol [sic] which reflects [sic] that of Dr. Winemiller. I am in disagreement with Dr. Caughlin [sic] that she does not have any work remaining [sic] capacity.

6. The claim filed does not support a loss of functional ability in the cognitive and/or psychological areas as determined by outcomes testing.

I have reviewed all information, records, and data provided to me by the company personnel, bearing on the questions which I am by training and experience able to answer.

Administrative Record at 836–37.

Unum also had Torgeson's records independently reviewed by Dr. Keith A. Caruso, a consultant in psychiatry and forensic psychiatry. Administrative Record at 863–66. In his initial report, Dr. Caruso also summarized Torgeson's treatment records, focusing on cognitive and psychological issues. Administrative Record at 863–65. He then provided the following assessment and answers to the questions posed to him:

**My Assessment:** The record fails to support the diagnosis of Major Depression, although a depressive disorder is suggested.

There is inadequate documentation of symptoms to meet diagnostic criteria for this condition.

What evidence is supplied is inconsistent with regard to the severity of her depressive complaints, which seem to be overshadowed by her Fibromyalgia.

Her condition is repeatedly treated with submaximal doses of antidepressant, which would be inconsistent with a severely disabling Major Depression.

Ms. Torgeson does not appear to support the position that she suffers from impairment due to a depressive disorder.

Her psychiatrist seems to indicate that whatever R & L's she has are due to an organic condition, rather than a psychiatric disorder.

**REFERRAL QUESTIONS:**

**Does the claim file documentation support a loss of functional abilities in the cognitive and/or psychological areas? Please clarify.**

The data provided do not support a loss of functional abilities in cognitive or psychological areas, as detailed above.

**Does the claim file reference any unavailable records of treatment that if obtained would provide you with a better understanding of the employee's clinical status?**

No.

**Appeals specialist has requested peer to peer phone calls if further clarification is needed from AP [Attending Physician].**

A call was placed but I was unable to speak with Dr. Armstrong. I have thus written to Dr. Armstrong for clarification.

I hold the above opinions with a reasonable degree of medical certainty.

Administrative Record at 865–66.

As indicated, Dr. Caruso did write Dr. Armstrong, Torgeson's treating psychiatrist, on June 13, 2005, to pose the following questions:

**My questions are as follows:**

1. As records failed to list enough depressive symptoms to meet criteria for Major Depression, what are Ms. Torgeson's depressive symptoms?

2. Do any of these symptoms result in the impairment that you noted above in their own right or do you see her as impaired by Fibromyalgia with some additional exacerbation by her depressive symptoms?

3. In light of prior neuropsychological assessments that failed to document significant cognitive deficits, on what objective measures do you base your statements that she has impairment in attention and concentration?

4. As your report indicated that Ms. Torgeson would be absent from work on a twice monthly basis, what would you recommend as restrictions and limitations and from what date would these apply?

Administrative Record at 868–69. On July 5, 2005, after receiving a response from Dr. Armstrong to his inquiries, *see* Administrative Record at 881, Dr. Caruso filed an Addendum to his medical claim analysis, showing some differences in his assessment and answers to referral questions:

My Assessment: The record supports the diagnosis of Major Depression.

Symptoms included insomnia, psychomotor retardation, tearfulness, dysphoric mood, no energy, decreased concentration, and weight loss.

Her condition is repeatedly treated with submaximal doses of antidepressant, which would be inconsistent with a severely disabling Major Depression.

Ms. Torgeson does not appear to support the position that she suffers from impairment due to a depressive disorder.

Her psychiatrist indicated that Fibromyalgia was her primary problem "with some additional exacerbation by her depressive symptoms."

Thus, there is not evidence of impairment due primarily to a psychiatric disorder. If a co-morbidity analysis reveals that Fibromyalgia contributes a degree of impairment that is just short of the threshold for significant impairment, then the additional contribution of her depressive symptoms may bring her overall condition to one of significant impairment requiring R & L's.

REFERRAL QUESTIONS:

Does the claim file documentation support a loss of fundamental abilities in the cognitive and/or psychological areas? Please clarify.

The data provided do not support an independently significant loss of functional abilities in cognitive or psychological areas due to her psychiatric condition alone; if she suffers a degree of impairment close to the threshold for R & L's due to Fibromyalgia, then a co-morbidity analysis may indicate that the sum total of her symptoms from Fibromyalgia and Major Depression combined may reach significant impairment warranting R & L's.

Does the claim file reference any unavailable records of treatment that if obtained would provide you with a better understanding of the employee's clinical status?

No.

Appeals specialist has requested peer to peer phone calls if further clarification is needed from AP.

Task completed.

I hold the above opinions with a reasonable degree of medical certainty.

Administrative Record at 877–78.

Based on these further medical reviews, Unum notified Torgeson's attorneys (and other interested parties) by letter dated July 26, 2005, that Unum had determined that its original decision to deny Torgeson's claim was appropriate. Administrative Record at 886–89. The critical portion of the letter stating Unum's rationale for denying Torgeson's appeal was the following paragraph:

> [T]he record reflects that Ms. Torgeson has had diffuse myalgias and arthralgias for several years prior to ceasing full-time work. She continued to work off and on, with and without an accommodated work schedule. According to Dr. Armstrong, Ms. Torgeson has returned to work at a retail outlet 4–8 hours per week. There is insufficient clinical data to support a change in her condition or data to support that her condition, at the time she ceased work, was of such severity, she was limited from performing her occupation. The record does not clearly indicate why Ms. Torgeson would be incapable of returning to her own occupation as an office Nurse II at the Mason City Clinic on a full-time basis.

Administrative Record at 888. Thus, Unum concluded that Torgeson did not meet the definition of "disability" as defined by the Plan. Administrative Record at 889.

This action for judicial review followed on August 30, 2005.

## II. LEGAL ANALYSIS

### A. What Standard Of Review Applies?

 Where an ERISA plan grants its administrator discretion to decide questions of eligibility for benefits or to construe plan terms, judicial review of the administrator's determinations "generally is limited to the abuse of discretion standard." *Alliant Techsystems, Inc. v. Marks,* 465 F.3d 864 (8th Cir.2006) (publication pages not yet available). Even where the plan purports to give the administrator such discretion, however, a less deferential standard of review is applicable where a claimant offers evidence that " " 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.' " " *Hillery v. Metropolitan Life Ins. Co.,* 453 F.3d 1087, 1090 (8th Cir.2006) (quoting *Chronister v. Baptist Health,* 442 F.3d 648, 654 (8th Cir.2006), in turn quoting *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998)). Torgeson asserts that circumstances warranting less deferential review are present here. Therefore, before embarking on its judicial review of Unum's denial of Torgeson's application for LTD benefits, the court must first determine the standard of review that will apply in that review.

#### 1. Arguments of the parties

Torgeson acknowledges that the Plan at least arguably gives Unum, as the administrator of the Plan, the discretion to make the determinations at issue here. Nevertheless, she argues that deferential review is not appropriate in this case, because there were serious procedural irregularities in Unum's consideration of her claim. The procedural irregularities that she identified in her initial brief on the merits are the following: (1) failure to consider the co-morbidity of Torgeson's impairments; and (2) failure to treat Torgeson in the same manner that Unum treated similarly-situated claimants.[8]

---

8. Torgeson argues at various points in her initial and reply briefs that the irregularities

More specifically, as to the latter point, Torgeson argues that Unum treated her differently than other claimants, because Unum failed to apply in her case the standards set forth in the Unum Multistate Regulatory Settlement Agreement (RSA).[9] She contends that the RSA specifically provides that opinions provided by treating physicians will receive deference, that the co-morbid effect of impairments will be considered, and that the need to provide "objective" evidence will not be improperly imposed, but that she did not receive such consideration. She also argues that it is reasonable to assume that her claim received the same deficient treatment as the claims of the litigants that led to the RSA and the California settlements.

In contrast, Unum contends that Torgeson has not identified any basis for applying any less deferential standard of review than "abuse of discretion." As to what both Unum and the court take to be Torgeson's primary argument for less deferential review, Unum contends that there is simply no evidence that Torgeson's claim was treated any differently than any other claimant's claim. Unum also argues that none of Torgeson's allegations meet the Eighth Circuit's standards for less-deferential review, because there is no evidence that any supposed conflict of interest or other irregularity was so egregious

as to create a total lack of faith in the integrity of the decision-making process. Unum also contends that the RSA involved a claim reassessment process that is not applicable to this case and that the RSA, itself, states that it cannot be interpreted to either reduce or increase the rights of participants in ERISA-governed plans. Unum points out that Torgeson does not identify any specific provision of the RSA that was purportedly violated. Indeed, Unum contends that there is no connection between the RSA and the handling of Torgeson's claim.

In reply, Torgeson argues that this court should apply *de novo* review. For the first time in her briefing, Torgeson argues in her reply that there is an inherent conflict of interest when the insurer responsible for payment of claims from its own assets also administers the long-term disability benefits plan at issue.[10] Reiterating points previously raised, Torgeson also argues that the RSA is substantively relevant to the question of whether or not she was treated in the same way as similarly-situated claimants, particularly as to construction and application of the Plan at issue. Torgeson now cites specific language of the RSA requiring Unum to consider co-morbid conditions and, more specifically, to refer a claimant's file to a generalist or

---

justifying less deferential review "include" failure to treat her in the same way as similarly situated claimants and failure to consider co-morbidity of her impairments, but she does not actually identify any other "irregularities" in her initial brief on the merits.

9. *See* http://w3.unump rovident.com/fmtwnet/Stream-File.aspx?strURL=/r/DC5FAF 40–5673–4472–B028–446BDC27CA12.pdf; *see also* California Settlement Agreement, http://www.insurance.ca.gov/0400–news/0100–press–releases/ 0080–2005/upload/CSA.pdf.

10. Torgeson argues in her reply that Unum's contention that she never argued that there

was a conflict of interest in this case is "baseless," citing the page of Unum's brief on which Unum made that contention, but she does not cite any portion of her initial brief on the merits in which she argued that there was such a conflict of interest. A word search of Torgeson's brief, as filed on the court's electronic docketing system, did not reveal any instance of the word "conflict" in Torgeson's initial brief on the merits. Thus, the court finds that what is "baseless" is Torgeson's contention that she ever asserted "conflict of interest" as a basis for less deferential review in this case prior to her reply.

primary care physician to consider the effects of all conditions on overall function and limitations when there are co-morbid conditions present. Torgeson asserts that, despite Dr. Caruso's recognition that Torgeson's co-morbid depression could put her over the threshold of impairment, if her fibromyalgia placed her close to that threshold, Unum did not make the required referral to a general practitioner to review the effect of her co-morbid conditions. She also contends that Unum failed to obtain a first-hand assessment of her condition and, instead, relied on reviews by in-house physicians who never actually saw her and never actually investigated the details of her occupation, and that Unum failed to consult a vocational expert. She contends, next, that even though she did not participate in the reassessment covered by the RSA, the procedures in the RSA to which Unum agreed show that she received inferior treatment, even though she was similarly situated. She contends that, of Unum's medical reviewers, only Dr. Caruso considered that her conditions could have co-morbid effects, but that, despite his observations, Unum preferred to pigeonhole her various conditions with different doctors. She also argues that Unum's suggestion that she was malingering to obtain drugs suggests a further procedural irregularity on which less deferential review could be based.

### 2. Analysis

■ As explained briefly above, a less deferential standard of review is applicable where a claimant offers evidence that " " 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.' " " *Hillery*, 453 F.3d at 1090 (quoting *Chronister*, 442 F.3d at 654, in turn quoting *Woo*, 144 F.3d at 1160). The Eighth Circuit Court of Appeals has explained that evidence that may give rise to such "serious doubts" is evidence of "a palpable conflict of interest or a serious procedural irregularity" which "cause[d] a serious breach of the plan administrator's fiduciary duty" to the claimant. *Woo*, 144 F.3d at 1160–61; *accord Hillery*, 453 F.3d at 1090 (quoting *Woo* for this explanation). Torgeson argues that there were both "conflicts of interest" and "procedural irregularities" in her case warranting less deferential review.

#### a. Conflict of interest

■ Torgeson asserted for the first time in her reply that less deferential review is warranted in this case, in part, because of the inherent conflict of interest between Unum's responsibility to pay claims from its own assets and its administration of the LTD benefits plan at issue here. Ordinarily, inclusion of a new argument in a reply brief is improper as a matter of motion practice in this court, *see* N.D. Ia. L.R. 7.1(g); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F.Supp.2d 977, 992 n. 4 (N.D.Iowa 2004); *Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161, 1169 n. 1 (N.D.Iowa 2003), and, indeed, in this circuit. *See Republican Party of Minn. v. Kelly*, 247 F.3d 854, 881 (8th Cir.2001) ("It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," citing *United States v. Vincent*, 167 F.3d 428, 432 (8th Cir.), *cert. denied*, 528 U.S. 848, 120 S.Ct. 124, 145 L.Ed.2d 105 (1999); *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir.1998); *United States v. Davis*, 52 F.3d 781, 783 (8th Cir.1995); *French v. Beard*, 993 F.2d 160, 161 (8th Cir.1993), *cert. denied*, 510 U.S. 1051, 114 S.Ct. 706, 126 L.Ed.2d 672 (1994)); *accord Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir.2006) ("As a general rule, we will not consider arguments raised for

the first time in a reply brief."). Therefore, the court need not consider Torgeson's "new" conflict-of-interest argument here.

■ Although it need not do so, the court is not precluded from considering an argument raised for the first time in a reply brief, and may choose to do so where, for example, the belated argument supplements an argument raised in a party's initial brief, *see Barham*, 441 F.3d at 586, where the opposing party was obviously prepared for the untimely argument, *see, e.g., Park v. Hill*, 380 F.Supp.2d 1002, 1014 (N.D.Iowa 2005) (the court would not have considered an issue raised for the first time in a reply, were it not for the fact that the opposing party was obviously prepared to meet that argument), or where the belated argument is without merit. *See, e.g., Bunda v. Potter*, 369 F.Supp.2d 1039, 1056 (N.D.Iowa 2005) (if the court were to consider the party's belated argument, the court would reject it). Even if the court were to consider Torgeson's untimely "conflict of interest" argument, the court finds that less deferential review is not warranted on that ground. As the Eighth Circuit Court of Appeals has repeatedly explained, " '[I]t is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer.' " *Chronister*, 442 F.3d at 655 (quoting *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1030 (8th Cir. 2000)). As in *Chronister*, Torgeson has relied entirely on such an assumption, but " 'has presented no evidence that the alleged financial conflict had a connection to the substantive decision reached.' " *Id.* (again quoting *McGarrah*, 234 F.3d at 1030, in turn quoting *Sahulka v. Lucent Tech., Inc.*, 206 F.3d 763, 768 (8th Cir. 2000)). Therefore, the court turns to the grounds for less deferential review that Torgeson has properly asserted.

### b. *Procedural irregularities*

■ Torgeson asserts that the following "procedural irregularities" warrant less deferential review in this case: (1) failure to consider the co-morbidity of Torgeson's impairments; and (2) failure to treat Torgeson in the same manner that Unum treated similarly-situated claimants. Although "procedural irregularities" may provide the basis for less deferential review of an ERISA plan administrator's decision, *Woo*, 144 F.3d at 1160–61; *accord Hillery*, 453 F.3d at 1090 (quoting *Woo* for this explanation), it is not the "mere presence" of such "procedural irregularities" that warrants less deferential review. *Hillery*, 453 F.3d at 1090 (citing *McGarrah*, 234 F.3d at 1031); *Chronister*, 442 F.3d at 655 (also citing *McGarrah*). Rather, "[t]o invoke this standard, any alleged procedural irregularity must be so egregious that it might create a 'total lack of faith in the integrity of the decision making process.' " *Id.* (quoting *Layes v. Mead Corp.*, 132 F.3d 1246, 1251 (8th Cir. 1998)); *cf. Janssen v. Minneapolis Auto Dealers Ben. Fund*, 447 F.3d 1109, 1113 (8th Cir.2006) ("Even where a plan administrator enjoys discretion, a less deferential standard of review is applied if a plan beneficiary 'present[s] material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty....' ") (quoting *Woo*, 144 F.3d at 1160). Where there is no evidence of any procedural irregularity of sufficient magnitude, the less deferential standard does not apply, and this court reviews only for abuse of discretion. *Hillery*, 453 F.3d at 1091.

■ The Eighth Circuit Court of Appeals has explained that a "procedural irregularity" occurs when a plan admin-

istrator's decision " 'was made without reflection or judgment, such that it was the product of an arbitrary decision or the plan administrator's whim.' " *Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 838 (8th Cir.2006) (quoting *Buttram v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996)); *accord Parkman v. Prudential Ins. Co. of Am.*, 439 F.3d 767, 772 n. 5 (8th Cir.2006) (quoting *Pralutsky* ). Thus, making a decision without knowing all of the circumstances involved is a "procedural irregularity" sufficient to invoke less deferential review, but consideration of all of the relevant information is not. *Compare Janssen*, 447 F.3d at 1113 (less deferential review was appropriate when the trustees appeared to make their decision without knowing the circumstances surrounding the plan's subrogation interest), *with Hillery*, 453 F.3d at 1090 (there was no procedural irregularity warranting less deferential review when the administrator considered all of the claimant's relevant medical information, considered all of the claimant's complaints, conducted a reasonable physical examination, and considered her treating physicians' opinions). The plan beneficiary must also show that the procedural irregularity has "some connection to the substantive decision reached" by the plan administrator. *Janssen*, 447 F.3d at 1113. Thus, even where there is some failure on the administrator's part to consider information that the claimant contends is relevant or some defect in the administrator's notice of the claimant's rights, those "irregularities" are not necessarily so egregious that they warrant less deferential review, in the absence of evidence that those "irregularities" had any connection to the substantive decision reached. *See Chronister*, 442 F.3d at 655 (neither failure to consider a claimant's Social Security disability records or award nor failure to include information about appeal rights in a denial letter was sufficient to invoke less deferential review, because there was no showing of a connection to the substantive decision reached).

■ Leaving aside for now whether Unum's review of the medical records was, ultimately, adequate and whether Unum's benefits determination was appropriate, it is clear that Unum did not so completely ignore Torgeson's medical records, the opinions of her treating physicians, or the possible disabling effects of the co-morbidity of her conditions on her ability to work that less deferential review is appropriate. *See Hillery*, 453 F.3d at 1090 (there was no procedural irregularity warranting less deferential review when the administrator considered all of the claimant's relevant medical information, considered all of the claimant's complaints, conducted a reasonable physical examination, and considered her treating physicians' opinions). Rather, the record shows that Unum did attempt to assemble and review all of Torgeson's available medical records at each stage in the benefits determination and appeal process, did consider—and indeed, believed that it was relying on—treating physicians' opinions about her ability to return to work full-time, did seek medical reviews at each stage of the benefits determination, and did ask for medical reviews of co-morbidity impacts. Thus, even if "wrong," or in some respect involving an abuse of discretion, Unum's decision was not "made without reflection or judgment, such that it was the product of an arbitrary decision or the plan administrator's whim." *Pralutsky*, 435 F.3d at 838 (citations omitted) (so defining a "procedural irregularity"); *see also id.* ("The administrator's decision—whether right or wrong, reasonable or unreasonable—was not made 'without

knowledge of or inquiry into the relevant circumstances and merely as a result of [its] arbitrary decision or whim.' ") (citing RESTATEMENT (SECOND) OF TRUSTS § 187, cmt. h, for this standard). Nor is it so clear to the court that Unum improperly *required* objective medical evidence of impairments, rather than finding that the *existing* objective medical evidence and subjective complaints did not support claimed impairments, that Unum's conduct in that respect constituted a "procedural irregularity." These conclusions also demonstrate that, even if the handling of claims under the RSA is illustrative of how "similarly situated" claimants were to be treated, Torgeson's treatment was not so substantially different as to constitute a "procedural irregularity."

In other words, none of the "procedural irregularities" identified by Torgeson is "so egregious that it might create a 'total lack of faith in the integrity of the decision making process.' " *Hillery*, 453 F.3d at 1090 (quoting *Layes*, 132 F.3d at 1251). Under these circumstances, the court will review Unum's denial of Torgeson's claim for LTD benefits under the Plan only for abuse of discretion.

### B. The Applicable Standard Of Review

 Under the applicable "abuse of discretion" standard of review, " '[t]he plan administrator's decision to deny benefits will stand if a reasonable person could have reached a similar decision." *Hillery*, 453 F.3d at 1090 (quoting *Woo*, 144 F.3d at 1162). To put it another way, the administrator's decision need be only reasonable, meaning that it must be supported by substantial evidence, and that decision will be reversed only if it was arbitrary and capricious. *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir.2006); *Chronister*, 442 F.3d at 656 (also stating the "substantial evidence" standard of "reasonableness" for "abuse of discretion" review).

This court may not substitute its own judgment for that of the plan administrator. *Id.* Thus, if the plan administrator's decision satisfies the "substantial evidence" requirement, it " 'should not be disturbed even if another reasonable, but different, interpretation may be made.' " *Chronister*, 442 F.3d at 656 (quoting *McGarrah*, 234 F.3d at 1031).

### C. Application Of The Standard

The court will summarize the parties' arguments on the merits of the case under the applicable "abuse of discretion" standard. The court will then turn to its assessment of whether or not Unum abused its discretion in denying Torgeson's claim for LTD benefits under the Plan.

#### 1. Arguments of the parties

#### a. Torgeson's initial arguments

In her initial brief on the merits, Torgeson contends that Unum abused its discretion in denying her claim, because Unum utterly failed to consider the combined effect of her multiple, co-morbid conditions on her ability to perform her occupation as an office nurse. She contends that Unum did so, even though Unum credited her diagnoses of fibromyalgia, chronic fatigue syndrome, and depression. She contends that, under applicable law, if a condition is specifically identified by a medical examiner on whom the Plan relies, that condition and the combined effects of all such conditions, must be addressed in the administrator's decision to deny benefits under the Plan. Torgeson also contends that consideration of the co-morbidity of her conditions was required under the terms of the RSA, Unum's multi-state settlement agreement concerning re-evaluation of certain claims. She also argues that Dr. Caruso, a reviewing psychiatrist, opined that, if her fibromyalgia put her just short of the threshold of disability, her symptoms

of depression might bring her overall condition to one of significant disability. Torgeson also contends that Dr. Armstrong concluded that the co-morbidity of her various impairments is what prevented her from working. She argues, further, that, despite Dr. Caruso's and Dr. Armstrong's opinions, Unum failed to seek further clarification of how her co-morbid impairments affected her ability to work and, instead, simply denied her claim for benefits.

Next, Torgeson contends that Unum improperly emphasized the relevance and importance of objective evidence, citing the initial claim denial letter. Administrative Record at 625–30. She contends that requiring objective evidence was inappropriate for a condition, such as fibromyalgia or chronic fatigue syndrome, that is dependent upon subjective symptoms.

She also argues that Unum unjustifiably rejected her treating physicians' opinions, while crediting the opinions of reviewing physicians who never examined her and who, in some cases, did not possess any particular expertise with her specific conditions. Although she acknowledges that plan administrators do not have to give deference to a treating physician's report, she argues that administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians. Similarly, she contends that Unum concluded that the medical information did not support impairments that would require changes in her work hours, but did so without consulting a vocational expert or providing reviewing physicians with the specific details of her occupation. She argues that Unum simply rejected overwhelming, consistent evidence from her treating physicians that she was unable to work.

Torgeson argues that she is not only disabled within the meaning of the Plan, but that she is entitled to all benefits due. She asserts that it is clear that she was limited from performing the material and substantial duties of her occupation as an office nurse and that she suffered more than a 20% loss in her indexed monthly earnings because of her impairments. Merely being able to perform some job duties or making a "heroic" effort to try to work, she contends, does not mean that she was not disabled. The clarity of her entitlement to benefits, she contends, is such that an award of benefits is appropriate, rather than a remand for purposes of another opportunity for Unum to consider her entitlement to benefits. She argues that, under the circumstances here, it would be inappropriate to give the Plan administrator a second (or third) bite at the apple, because the court cannot have any confidence that Unum will do correctly what it has thus far failed to do correctly or has failed to do at all.

#### b. Unum's response

In response, Unum does not dispute that Torgeson suffers from fibromyalgia, but does dispute Torgeson's assertion that Unum does not dispute that she suffers from any of her other alleged conditions. Indeed, Unum notes that it has always disputed Torgeson's contention that she suffers from "chronic fatigue syndrome," as opposed to "chronic fatigue," and that she suffers from a specific depressive or other cognitive disorder, rather than situational depression. Unum also details all of the medical records that it reviewed, noting the inconsistencies and uncertainties therein, and argues that those records show that the consensus even of Torgeson's treating physicians was that she should be able to work full-time and that doing so was the course most likely to benefit her fibromyalgia. Unum characterizes the record as showing that Torge-

son's treating physicians only reluctantly gave in to her demands for work restrictions and off-work status, when they did not believe such restrictions were necessary or in her best long-term interest. Although Unum does not doubt the sincerity of Torgeson's belief that she cannot work, Unum does doubt that the record objectively supports that belief. Thus, Unum contends that Torgeson may have made a personal choice to stop working, but that Unum reasonably concluded that her choice was not because of medical limitations arising from an illness.

Unum also argues that there is nothing "arbitrary" about the detailed and painstaking way in which it attempted to evaluate Torgeson's claim for LTD benefits and the conflicting opinions among her treating physicians as to whether or not she was totally disabled. Unum argues that its ultimate conclusion was consistent with the opinions of three of Torgeson's treating physicians, two of whom were specialists in fibromyalgia and chronic pain. Unum also argues that there is "compelling" evidence in the record tainting Torgeson's credibility on the basis that she actively sought out and ultimately found a physician who would provide her with the "total disability" opinion that she desired. In essence, then, Unum argues that it reasonably resolved the conflicts in the record in denying Torgeson's claim for LTD benefits.

### c. Torgeson's reply

In the portion of her reply brief devoted to the merits of her claim for LTD benefits, Torgeson reiterates that Unum failed to give her claim the full and fair review required by ERISA. Specifically, she reiterates that Unum failed to consider the co-morbidity of her various conditions, instead completely discounting her evidence of depression and considering her pain and fatigue conditions separately. For example, she credits Dr. Caruso with seeking more information from Dr. Armstrong about the effects of her depression alone and with other conditions, but chastises Unum for ignoring Dr. Armstrong's response to Dr. Caruso's inquiries and otherwise failing to consider the impact of her various conditions on her ability to pursue her occupation as an office nurse. She also reiterates her contention that Unum improperly overemphasized the relevance and importance of objective evidence, while ignoring much of the objective medical evidence in the record concerning her psychological testing, and also ignoring the fact that conditions like fibromyalgia and chronic fatigue syndrome are not readily amenable to objective measurement, and indeed, that such tests may not exist, because those conditions depend upon subjective symptoms. She also argues that Unum did not reserve the right under the Plan to demand objective evidence to support alleged symptoms.

### 2. Discussion

The court will consider, in turn, Torgeson's various contentions that Unum's denial of her application for LTD benefits was an abuse of discretion. Those contentions can be categorized as follows: Unum's improper reliance on a supposed lack of objective evidence to support Torgeson's conditions and impairments; Unum's improper rejection of Torgeson's treating physicians' opinions; Unum's failure to consider the co-morbidity of Torgeson's various conditions; and Unum's failure to find that Torgeson was "disabled" within the meaning of the Plan. She contends that, because she was clearly "disabled" within the meaning of the Plan, she is entitled to all benefits due without a remand to Unum for further consideration.

### a. Improper reliance on a lack of objective evidence

Torgeson contends, first, that Unum abused its discretion by improperly em-

phasizing the relevance and importance of objective evidence, while failing to recognize that conditions such as fibromyalgia and chronic fatigue syndrome are not amenable to such evidence, because they are dependent upon subjective symptoms. Unum contends, in essence, that Torgeson may have sincerely and subjectively believed that she could not work, but that the record does not objectively support that belief.

The Eighth Circuit Court of Appeals recently summarized the circumstances in which a plan administrator's insistence upon objective medical evidence is an abuse of discretion and those in which it is not:

> We have said that in some circumstances a plan administrator's insistence on objective medical evidence can be unreasonable. In *House v. Paul Revere Life Insurance Co.*, 241 F.3d 1045 (8th Cir.2001), we concluded that it was an abuse of discretion for a plan administrator to insist on "objective medical evidence" of heart disease, where the plan documents advised only that the administrator "may require medical exams or written proof of *financial* loss," and stipulated that if a medical exam was required, the administrator would pay for it. *Id.* at 1048 (emphasis added). There may be other cases in which objective evidence simply cannot be obtained, and it would be unreasonable for an administrator to demand the impossible. *See Brigham v. Sun Life of Can.*, 317 F.3d 72, 84 (1st Cir.2003). And it may well be unreasonable for an administrator to expect a claimant to provide "objective evidence" if the administrator does not provide an adequate explanation of the information sought.
>
> We have held elsewhere, however, that "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence,"

*McGee v. Reliance Standard Life Insurance Co.*, 360 F.3d 921, 924–25 (8th Cir.2004), and *House* does not state a universal rule that an administrator is precluded from insisting on objective medical evidence when it is appropriate under the terms of a plan and the circumstances of the case. *See also Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir.2005) (per curiam) (upholding a denial of benefits where objective medical evidence did not support claimed disability from restless leg syndrome and related problems); *Coker v. Metro. Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir.2002) (finding denial of benefits not unreasonable where objective medical evidence did not support claimant's contention that he was disabled by diabetes and syncopal episodes). The plan in this case states that the claimant must provide, at her own expense, "documented proof of [her] Disability," and that if the claimant does not provide "satisfactory documentation within 60 days after the date we ask for it," the claim may be denied. (A.R. at 166–67). The plan does not define what sort of "proof" or "documentation" is sufficient to establish a disability, and the administrator is entitled to define those ambiguous terms as long as its interpretation is reasonable. *See King*, 414 F.3d at 999; *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir.1992). In view of our precedent affirming the reasonableness of a plan administrator denying benefits based on a lack of objective evidence, we cannot say, as a general matter, that it is unreasonable for MetLife to interpret the plan to require provision of objective evidence as part of the "proof" and "documentation" that a claimant must submit.

*Pralutsky*, 435 F.3d at 838–39.

Although the court in *Pralutsky* ultimately held that the plan administrator

had not abused its discretion by demanding objective evidence in that case, Torgeson seeks to distinguish *Pralutsky* on the ground that the reason that the court in *Pralutsky* upheld denial of LTD benefits for lack of objective evidence was that the plaintiff failed to provide current treatment information or clinical notes, despite the administrator's repeated requests for such records. In her case, however, Torgeson contends that she has submitted complete, longitudinal records from her treating physicians and an independent psychological evaluation by Dr. Roland prepared in response to her claim for Social Security disability benefits. She also contends that the "trigger point test" is sufficient objective support for a diagnosis of fibromyalgia, in large part, because that condition is otherwise dependent upon subjective description of symptoms.

In its November 16, 2004, letter denying Torgeson's claim for LTD benefits, Unum summarized the reasons for denying the claim as including the following:

> There is no documented testing, labs, or imaging studies to support your reported pain and fatigue at a level that would support the restrictions and limitations as outlined on page 2 [from Drs. Caughlan, Frame, and Trimble].
>
> \* \* \*
>
> There is no cognitive or Neuropsychological testing in regards to your complaints of difficulty with short-term memory and concentration, inability to focus on job duties and lack of attention. The medical information received does not document any significant changes in physical exams or testing around the time you stopped working or when your work schedule was reduced to 3 days per week.

Administrative Record at 628–29. In light of these grounds for denying Torgeson's claim, the court finds that Unum did, indeed, require objective medical evidence to support Torgeson's claim for LTD benefits.

 The questions under *Pralutsky*, thus, are (1) whether "it [wa]s appropriate under the terms of a plan" to require such objective medical evidence, and (2) whether it was appropriate to do so "in the circumstances of the case." *Pralutsky*, 435 F.3d at 839. Unum entirely overlooks the first question, attempting to answer only the second by contending that Torgeson's complaints of a disabling impairment were supported by nothing more than her own subjective complaints of pain and fatigue, and that the documents submitted by Torgeson did not support her alleged impairments. *See* Defendant's Brief at 32 & 53.

 As to the first question, whether insistence upon objective evidence was appropriate under the Plan terms, *Pralutsky*, 435 F.3d at 839—which cannot be overlooked as adroitly as Unum has done—the Plan states as follows:

> We may require you to be examined by a physician, other medical practitioner and/or vocational expert of our choice. Unum will pay for this examination. We can require an examination as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Unum Representative.

Administrative Record at 146. The Eighth Circuit Court of Appeals noted in *Pralutsky* that such a plan provision was not sufficient to authorize a plan administrator to demand objective medical evidence. *See Pralutsky*, 435 F.3d at 838–39 (citing *House v. Paul Revere Life Insurance Co.*, 241 F.3d 1045, 1048 (8th Cir.2001), as holding that a plan administrator abused its discretion by demanding "objective medical evidence" of heart disease, where the plan documents advised only that the ad-

ministrator "may require medical exams or written proof of *financial* loss," and stipulated that, if a medical exam was required, the administrator would pay for it). Certainly, Unum has pointed to nothing in the Plan that is comparable to the authorization to rely on objective medical evidence found sufficient in *Pralutsky*. *Id.* at 839 ("The plan in this case states that the claimant must provide, at her own expense, 'documented proof of [her] Disability,' and that if the claimant does not provide 'satisfactory documentation within 60 days after the date we ask for it,' the claim may be denied. (A.R. at 166–67). The plan does not define what sort of 'proof' or 'documentation' is sufficient to establish a disability, and the administrator is entitled to define those ambiguous terms as long as its interpretation is reasonable."). Thus, the court concludes that Unum abused its discretion by relying on the lack of objective medical evidence to support Torgeson's claims of disability, where the Plan did not authorize Unum to demand or rely upon such evidence. *Pralutsky*, 435 F.3d at 839 (first prong of the inquiry concerning an objective evidence requirement).

Moreover, Torgeson is correct that Unum never did do what the Plan did authorize Unum to do to evaluate Torgeson's disability claim, which was to demand (and pay for) an examination by a physician. *See* Administrative Record at 146. Instead, Unum relied entirely on its review of the medical records provided. That, too, was an abuse of discretion, at least where Unum concluded that the medical records already submitted were insufficient to support Torgeson's claim for benefits.

■ Turning to the second prong of the *Pralutsky* inquiry, whether demanding objective medical evidence is appropriate "in the circumstances of the case," *Pralutsky*, 435 F.3d at 838–39—the prong that Unum did address in its briefing—Torgeson claims that her conditions of fibromyalgia and chronic fatigue syndrome simply are not amenable to verification with objective medical evidence, because they are dependent upon subjective symptoms. The court finds that Torgeson's contention is supported by Eighth Circuit law.

Torgeson's contention that fibromyalgia is not amenable to objective evidence is supported by the decision of the Eighth Circuit Court of Appeals in *Chronister*, 442 F.3d at 656. In *Chronister*, the court noted that "Fibromyalgia is verifiable only through patient self-report," and reiterated its holding "that trigger-point test findings consistent with fibromyalgia constitute objective evidence of the disease." *Chronister*, 442 F.3d at 656 (citing *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809 (8th Cir.2006)). In *Chronister*, the court held that, where there was "trigger-point" verification, the claimant's medical condition of fibromyalgia did not rest "primarily on self-reported symptoms," and the district court did not err in finding that the plan administrator (also Unum in that case) abused its discretion by denying the claimant further benefits based solely upon a "self-reported symptoms limitation." *Id.*[11] Similarly, here, where there was "trigger-point" verification of Torgeson's fibromyalgia, her complaints about that condition did not rest "primarily on self-reported symptoms," but upon "objective evidence of the disease." *Id.* Thus, it was an abuse of discretion for Unum to demand objective evidence to support Torgeson's claim of disabling fibromyalgia, when

11. Unum has not contended that Torgeson's LTD benefit plan includes such a "self-report ed symptoms limitation."

that claim was already supported by adequate objective medical evidence.

Moreover, there has been no showing that objective evidence of fibromyalgia, beyond the "trigger-point" verification, can be obtained, so that it was unreasonable for Unum to demand the impossible. *See Pralutsky,* 435 F.3d at 839 (citing *Brigham,* 317 F.3d at 84). More specifically, it was unreasonable for Unum to expect Torgeson to provide "objective evidence" of fibromyalgia or the limitations caused by that condition when Unum did not provide any adequate explanation of the information it sought. *Id.* (opining that such circumstances might make it unreasonable for the administrator to demand objective evidence). Although Unum relied on the lack of "testing, labs, or imaging studies to support [Torgeson's] reported pain" and contended that "[t]he medical information received does not document any significant changes in physical exams or testing around the time [Torgeson] stopped working or when [her] work schedule was reduced to 3 days per week," Administrative Record at 628–29, Unum has not shown—and certainly did not explain to Torgeson at the times that it denied her claim—that there are any such tests, labs, imaging studies, or physical exams that would have demonstrated the effect of Torgeson's fibromyalgia. Thus, as to Torgeson's fibromyalgia, Unum abused its discretion in demanding objective medical evidence and in relying on the supposed lack of such evidence as a basis for denying Torgeson's claim for LTD benefits.

Turning to chronic fatigue, the Third Circuit Court of Appeals has held that it was arbitrary and capricious for an administrator to deny LTD benefits on the ground that the claimant did not provide objective medical evidence of chronic fatigue syndrome, because the administrator had not identified any more objective evidence that the claimant could have submitted to support his disability claim. *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442–43 (3d Cir.1997). Similarly, the Eighth Circuit Court of Appeals has observed that, "[w]hile fatigue is difficult to assess, disability plan administrators may not require objective medical evidence of the cause if there is consistent evidence of disability symptoms, and no finding that the claimant is not credible in her complaints." *Abram v. Cargill, Inc.,* 395 F.3d 882, 887 n. 3 (citing *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 442–43 (3rd Cir. 1997), and *Wilkins v. Hartford Life & Acc. Ins. Co.,* 299 F.3d 945, 947 n. 1 (8th Cir. 2002)). In Torgeson's case, Unum also relied on the lack of "documented testing, labs, or imaging studies to support [her] reported . . . fatigue at a level that would support the restrictions and limitations," Administrative Record at 628–29, but Unum has not identified any "testing, labs, or imaging studies" that Torgeson could have submitted to verify the level of fatigue that she subjectively experienced. *See Mitchell,* 113 F.3d at 442–43. Here, there was undoubtedly consistent evidence of fatigue symptoms and, apart from Unum's unsupported opinion, no finding by any treating physician, and no basis in the record for any such finding, that Torgeson's complaints about fatigue were not credible. *Abram,* 395 F.3d at 887 n. 3. Unum also relied on the lack of documentation of "any significant changes in physical exams or testing around the time [Torgeson] stopped working or when [her] work schedule was reduced to 3 days per week," Administrative Record at 629, but again, did so without identifying what such physical exams or testing might be for conditions like chronic fatigue syndrome, which depend upon subjective symptoms. *Mitchell,* 113 F.3d at 442–43; *cf. Pralutsky,* 435 F.3d at 839 (opining that such circumstances might make it unreasonable

for the administrator to demand objective evidence).

Unum appears to contend that it did no more than look at the record for "objective" support for the *physical limitations* purportedly imposed by Torgeson's claimed symptoms of pain and fatigue. It is true that the First Circuit Court of Appeals has observed, "While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003). The court finds such a view is nothing more than unrealistic hair-splitting: There is no more indication of what would be objective evidence of the *limitations* imposed by subjective symptoms of conditions like fibromyalgia or chronic fatigue than there is any indication of what would be objective evidence of the *conditions* themselves.

Thus, the court concludes that Unum abused its discretion in demanding objective medical evidence to support Torgeson's fibromyalgia and chronic fatigue conditions (whether or not her "chronic fatigue" was properly diagnosed as "chronic fatigue syndrome," rather than "chronic fatigue" secondary to her fibromyalgia) *and* limitations imposed by those conditions.

The court will, nevertheless, consider other respects in which Torgeson asserts that Unum abused its discretion.

### b. *Improper rejection of treating physicians' opinions*

Torgeson next contends that Unum abused its discretion in rejecting her treating physicians' opinions concerning appropriate work restrictions, where she contends that those opinions "uniformly"

demonstrated that she could not work full-time, even if there were differences in the details of the kinds of restrictions that various physicians considered appropriate at various times. She contends that Dr. Kenik's generalizations about the ability of the majority of fibromyalgia patients to work do not offset the overwhelming evidence that her condition prevented her from working. Unum contends that it was not required to give special weight to the opinions of treating physicians and that, in any event, the opinions of Torgeson's treating physicians about the extent of her limitations were far from consistent. Thus, Unum contends that it properly relied on the evaluations of reviewing physicians.

Even if a treating physician's conclusions support the beneficiary's claim to LTD benefits, a plan administrator is entitled to rely on contrary conclusions by reviewing physicians, because the Supreme Court has made clear that "plan administrators need not accord special weight to treating physicians' opinions." *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir.2006) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 828 & 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)). Torgeson counters that, even so, an administrator may not arbitrarily refuse to credit a claimant's evidence, including the opinions of a treating physician. Torgeson is correct that, "[w]hen there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits *unless the record does not support denial.*" *Johnson v. Metropolitan Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir.2006) (emphasis added) (but finding that the record did support the denial of benefits in that case); *see also Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir.2002) ("Where

there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to find that the employee is not disabled *unless* 'the administrative decision lacks support in the record, or ... the evidence in support of the decision does not ring true and is ... overwhelmed by contrary evidence.' ") (emphasis added) (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir.1996)). This is a case in which the record does not support the denial. *Id.*

The opinion of Unum and its reviewing physicians was, in essence, that the treating physicians (with the exception of Dr. Caughlan) opined that Torgeson likely could (and should) return to full-time employment in her regular occupation, so that the various restrictions and limitations that the treating physicians placed upon Torgeson between her alleged date of disability, September 19, 2003, and the date of her application for LTD benefits under the Plan, August 2, 2004, were not supported by the record. *See, e.g.*, Administrative Appeal Decision, Administrative Record at 888. This reading of the record, however, fails to consider that *each treating physician consistently found that some restrictions and limitations were appropriate for significant periods of time after September 19, 2003, until Torgeson quit working at MCC,* even if the treating physicians believed that those restrictions were only temporary, or were not moving Torgeson back to full-time employment as quickly as the treating physicians desired.

Unum explains away the series of restrictions imposed by Torgeson's treating physicians as "giving in" to Torgeson's demands for certain restrictions, contrary to the physicians' clinical judgments about what restrictions were actually required. While each treating physician (with the exception of Dr. Caughlan) urged Torge-

son to attempt to return to full-time employment, nothing in the medical records that has been drawn to the court's attention shows that any treating physician considered Torgeson to be malingering or that the restrictions imposed, in the short term, were not justified, even if the long-term goal was to return Torgeson to work full-time. Unum patently abused its discretion by reading the treating physicians' long-term aspirations for Torgeson as any evidence that the restrictions imposed in the near term were not justified. Indeed, the *only* time that any treating physician cleared Torgeson to return to unrestricted full-time work after September 19, 2003, was on October 30, 2003, when Dr. Trimble *post hoc* authorized Torgeson's return to "unrestricted full time work 10–27–03," Administrative Record at 82, but Torgeson was soon placed back on restrictions, and was always subject to at least some restriction thereafter.

 To put it another way, the record here simply does not support a denial of benefits, *Johnson*, 437 F.3d at 814 (stating this standard as an exception to the rule that an administrator may deny benefits where there is a conflict between the opinions of treating physicians and reviewing physicians), because the evidence purportedly supporting the denial decision simply does not "ring true" in the face of overwhelming contrary evidence from treating physicians. *See Coker*, 281 F.3d at 799 (stating this standard) (quoting *Donaho*, 74 F.3d at 901). Thus, Unum also abused its discretion by rejecting the opinions of Torgeson's treating physicians concerning appropriate restrictions and limitations and, instead, relying on the opinions of reviewing physicians that her restrictions and limitations were not supported by the record.

### c. Failure to consider co-morbidity

Torgeson contends that Unum also abused its discretion by utterly failing to consider the combined effect of her multiple, co-morbid conditions on her ability to perform her occupation as an office nurse. She contends that Unum did so, even though Unum credited her diagnoses of fibromyalgia, chronic fatigue syndrome, and depression, Drs. Armstrong and Caruso recognized that the co-morbid effects of her conditions were disabling, and the RSA required Unum to consider co-morbidity. She contends that, under applicable law, if a condition is specifically identified by a medical examiner on whom the Plan relies, that condition and the combined effects of all such conditions, must be addressed in the administrator's decision to deny benefits under the Plan, citing *Abram v. Cargill, Inc.,* 395 F.3d 882, 887–88 (8th Cir.2005). Unum's response is to argue that none of Torgeson's allegedly disabling conditions supports the restrictions and limitations imposed by her treating physicians, without ever coming to grips with the essence of Torgeson's assertion that Unum abused its discretion by not considering the disabling effect of the sum of her various conditions.

Torgeson is correct that, in *Abram,* the Eighth Circuit Court of Appeals found that a remand to the plan administrator was appropriate for reevaluation of a denial of benefits, where the independent medical examiner identified three conditions—post-polio syndrome (PPS), depression, and obesity—that may have contributed to the claimant's disability, but the plan administrator improperly focused only on one of the claimant's conditions. *Abram,* at 887–

888. Worse still, the plan in *Abram* instructed the independent medical examiner to address only that one condition in his initial evaluation, and the medical examiner's second opinion letter identified a second condition as only a possible factor. *Id.* at 888. Thus, a plan administrator is required to consider all of a claimant's allegedly disabling conditions, at least where those conditions are recognized by examining physicians.

Here, there is no question that all of Torgeson's treating physicians recognized her conditions as including fatigue and depression in addition to fibromyalgia. The question for all of the treating physicians was not whether Torgeson suffered from fatigue and depression, but whether those conditions were separate conditions, such as "chronic fatigue syndrome" and a psychological or cognitive "disorder," or merely conditions secondary to her fibromyalgia. For example, Dr. Roland concluded that Torgeson was "clinically depressed despite the use of Effexor 150 mg a.m.," adding on Axis I of her diagnosis that Torgeson suffered from a "Major Depressive Disorder, single episode (DSM IV: 296.21)," Administrative Record at 655, while Dr. Armstrong opined that Torgeson's "depressive symptoms" could not be separated from her fibromyalgia and were, instead, "intricately [sic] intertwined" with her fibromyalgia. Administrative Record at 881.[12] Similarly, Dr. Caughlan expressly diagnosed Torgeson as suffering from "chronic fatigue syndrome," and concluded that Torgeson was "genuinely disabled," apparently by fibromyalgia *and* "chronic fatigue syndrome," Administrative Record at 24, and Dr. Frame accepted use of the term "chronic fatigue syndrome" as de-

---

**12.** Torgeson contends that this portion of Dr. Armstrong's opinion demonstrates that Dr. Armstrong believed that "the co-morbidity of plaintiff's impairments is what prevented her from working." Plaintiff's Brief at 13. The court finds this statement to be a mischaracterization of Dr. Armstrong's opinion, however, where what he actually opined was that the depression and fibromyalgia were "intertwined."

scribing Torgeson's fatigue condition, but acknowledged that she was not an expert on that condition, Administrative Record at 36, while other treating physicians referred only to "fatigue" in relation to Torgeson's fibromyalgia.

Unum's reviewing physicians, however, simply focused on whether or not Torgeson's diagnoses with "depression" and "chronic fatigue syndrome" were supported by medical evidence demonstrating separate conditions. Because the reviewing physicians concluded that a separate cognitive or psychological "depressive" condition could not properly be diagnosed on the record, and that "chronic fatigue syndrome" was not indicated by diagnostic symptoms, they apparently discounted completely any limiting effect of Torgeson's "depression" and "fatigue" in conjunction with her fibromyalgia. An exception is Dr. Caruso, who initially disputed a diagnosis of "major depression," but believed that Torgeson was nevertheless suffering a "depressive disorder," albeit one that did not cause any impairment. Administrative Record at 865–66. After receiving further information from Dr. Armstrong, Dr. Caruso revised his opinion to suggest that "if [Torgeson] suffers a degree of impairment close to the threshold for R & L's due to Fibromyalgia, then a co-morbidity analysis may indicate that the sum total of her symptoms from Fibromyalgia and Major Depression combined may reach significant impairment warranting R & L's." Administrative Record at 877–78. Torgeson is correct that Unum did not seek any "co-morbidity analysis" despite Dr. Caruso's latter opinion.

 The court finds that Unum abused its discretion in failing to consider the combined effect, or "co-morbidity," of all of the conditions supported by adequate medical evidence and opinions. *Abram*, 395

F.3d at 887–88. Although part of the medical review on administrative appeal purported to be a co-morbidity review, *see, e.g.*, Administrative Record at 768–69 (May 11, 2005, referral of Torgeson's medical file for further medical review, indicating "CO–MORBID REV REQ" under "Priority Notes"), the reviews themselves, with the exception of Dr. Caruso's, do not demonstrate that co-morbidity was ever properly considered. Indeed, none of the questions posed for the medical reviewers asked or required them to consider the comorbid effects of any combination of conditions. *See id.* Moreover, Unum simply ignored Dr. Caruso's suggestion that comorbidity might push Torgeson over the line into "disability," and Unum conducted no further "co-morbidity" review, despite Dr. Caruso's suggestion.

Thus, the court concludes that Unum also abused its discretion by failing to perform an adequate co-morbidity review, where several conditions were supported by more than adequate evidence in the record.

#### d. Failure to find "disability"

Finally, Torgeson challenges Unum's ultimate conclusion that she was not "disabled" within the meaning of the Plan. As explained in more detail above, beginning on page 6, the Plan in question employs *two* definitions of "disability." The Plan, Administrative Record at 146. The first definition, applicable during the first 24 months of payments, requires the claimant to be "**limited** from performing the **material and substantial duties** of your **regular occupation** due to [the claimant's] **sickness** or **injury**," and to have suffered "a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." *Id.* (emphasis in the original

indicating Plan terms defined elsewhere).[13] The second definition, applicable after 24 months of payments, defines a claimant as "disabled" only if the claimant is "unable to perform the duties of any **gainful occupation** for which [the claimant is] reasonably fitted by education, training or experience." *Id.* (emphasis in the original).

■■■ Where the terms of a LTD benefits plan require that the beneficiary be totally and permanently disabled to be eligible for benefits, a decision to deny benefits is reasonable if the treating physicians' conclusions demonstrate that there was only a possibility of or ambivalence about a permanent disability. *Alexander*, 453 F.3d at 1031. Thus, the opinions of treating physicians that Torgeson *might* return to full-time employment *might* be relevant here, if such a "total" and "permanent" disability definition were at issue. However, the *second* "total disability" definition in the Plan here never came into play in Torgeson's case at the time of Unum's denials of Torgeson's application for LTD benefits, either initially or on administrative appeal, because less than 24 months had elapsed from the date that Torgeson asserted she became disabled. Even if that second definition had come into play, that definition does not require "permanent" disability, only that after 24 months

of payments, the claimant continue to be "unable to perform the duties of any gainful occupation." The Plan, Administrative Record at 146.

Again, only the first definition of disability under the Plan is applicable here, because Unum only ever reviewed Torgeson's claim for LTD benefits during the first 24 months of her alleged disability, from September 19, 2003, to July 26, 2005, the date of Unum's denial of benefits on administrative appeal.[14] It does not appear to the court that Unum has ever disputed that Torgeson suffered "a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury." The Plan, Administrative Record at 146. Thus, the question is whether Unum properly denied Torgeson's application for LTD benefits based on its determination that Torgeson was not "**limited** from performing the **material and substantial duties** of [her] **regular occupation** due to [the claimant's] **sickness** or **injury**" during the period that her claim was under review. *Id.* (emphasis in the original indicating Plan terms defined elsewhere). The court can only conclude that Unum abused its discretion in denying Torgeson's claim under the applicable definition of "disabled," because Unum's ultimate decision was the result of several other de-

---

**13.** Torgeson erroneously asserts, at one point in her brief on the merits, that this definition requires "at least a 20% reduction in her ability to work." Plaintiff's Brief at 18. Under the plain language of the Plan, however, the required 20% reduction is in the claimant's "indexed monthly earnings," not the claimant's "ability to work."

**14.** Unum's reasons for denying Torgeson's claim for benefits on administrative appeal could be read to focus, improperly, on whether Torgeson was disabled at the time of her application for benefits, rather than on whether she had been disabled at any time after her alleged disability date of September 19, 2003. *See* Administrative Record at 888. ("There is

insufficient clinical data to support a change in her condition or data to support that her condition, *at the time she ceased work*, was of such severity, she was limited from performing her occupation. The record does not clearly indicate why Ms. Torgeson *would be incapable of returning to her own occupation* as an office Nurse II at the Mason City Clinic on a full-time basis.") (emphasis added). However, because the court concludes that Unum's initial denial of benefits was an abuse of discretion, and that reaffirming that denial on any ground was, likewise, an abuse of discretion, the court need not consider separately whether the decision on administrative appeal was deficient in any other respect.

terminations that the court has already concluded were an abuse of discretion: relying on a supposed lack of objective evidence to support Torgeson's claim; rejecting the opinions of Torgeson's treating physicians concerning appropriate restrictions and limitations and, instead, relying on the opinions of reviewing physicians that her restrictions and limitations were not supported by the record; and failing to consider the co-morbidity of Torgeson's various conditions.

■■■ Unum asserted that denial of benefits was appropriate, because there was no indication that Torgeson's conditions "changed" at the time she claims that she ceased being able to work or ceased being able to work full-time. Administrative Record at 629 (Unum relied on the lack of documentation of "any significant changes in physical exams or testing around the time [Torgeson] stopped working or when [her] work schedule was reduced to 3 days per week" as a basis for denial of her claim). Torgeson contends that, in addition to improperly requiring objective evidence, Unum's position was tantamount to punishing her for her "heroic" efforts to continue working, notwithstanding the disabling nature of her fibromyalgia, fatigue, and depression. Courts have held that a claimant's "herculean" or "heroic" efforts to continue working do not necessarily defeat a claim of partial or total disability, where substantial evidence demonstrates that the claimant was nonetheless "disabled" by any reasonable interpretation of the term. *See, e.g., Greene v. Director, Office of Workers' Compensation Progs., U.S. Dep't of Labor,* 889 F.2d 794, 797 (8th Cir.1989) (Benefits Review Board (BRB) decision concerning benefits under the Black Lung Benefits Act was reversed, because the BRB improperly rejected the ALJ's finding that "only the miner's herculean efforts allowed him to continue on the job, and that he was totally disabled by any reasonable interpretation of the phrase," and substantial evidence clearly underlay this finding, so that the BRB had erred by placing conclusive weight on the miner's continued coal mine work); *see also Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 918 (7th Cir.2003) ("A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working."). Thus, the fact that Torgeson continued to work, and then quit working without an apparent change in objective evidence concerning her conditions, is not necessarily evidence from which Unum could infer that she was not disabled.

■■■ Moreover, Unum mistakes both the applicable definition of "disability" under the Plan and the nature of the disabling conditions from which Torgeson suffered by imagining that some change in her conditions was required at or around the date she claimed she became disabled. Torgeson was not required to be entirely unable to work under the definition of "disability" applicable during the first 24 months of eligibility for payments; rather, she was only required to be "limited" in her ability to work at her regular occupation and to suffer at least a 20% reduction in her indexed monthly income. The Plan, Administrative Record at 146. Plainly, by specifying a reduction in income and a "limitation" in the ability to perform a claimant's regular occupation rather than a complete inability to perform that occupation, this definition of "disability" contemplates that a claimant may be able to pursue some degree of continued employment after the disability date. Thus, continuing to work, standing alone, cannot be a determinative factor in the denial of LTD disability benefits under the applicable definition of "disability." Moreover,

where the disabling condition is based on subjective symptoms, as fibromyalgia is, there may come a point where those subjective symptoms preclude full- or part-time employment without any change in physical attributes subject to objective testing. *See, e.g., Chronister,* 442 F.3d at 656 ("Fibromyalgia is verifiable only through patient self-report."). Thus, in light of the disability condition at issue here, an expectation of a change in objective examination results at or around the alleged "disability" date was unrealistic, and denial of a disability benefits claim on the basis that there had been no such change constituted an abuse of discretion.

Thus, Unum's denial of Torgeson's claim for LTD benefits must be reversed.

### D. The Appropriate Remedy

Because Unum's denial of benefits must be reversed, the court must consider whether to remand this matter to Unum for complete or limited reconsideration or, instead, to award benefits without a remand. Torgeson asserts that the clarity of her entitlement to benefits is such that an award of benefits due through August 2, 2004, is appropriate, rather than a remand for purposes of another opportunity for Unum to consider her entitlement to benefits, and that the court should also award prejudgment interest and attorney fees. She argues that, under the circumstances here, it would be inappropriate to give the Plan administrator a second (or third) bite at the apple, because the court cannot have any confidence that Unum will do correctly what it has thus far failed to do correctly or has failed to do at all. Because Unum asserted that its decision would have to be affirmed, even on *de novo* review, it made

no argument concerning the appropriate remedy if its decision was reversed.

### 1. Remand or award of benefits?

 Section 1132(a)(1)(B) permits a plan beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of ·the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, the court is authorized to award benefits due to a prevailing claimant. Nevertheless, a remand to the plan administrator is proper when the plan administrator fails to make adequate findings or adequately explain its reasoning. *Abram v. Cargill, Inc.,* 395 F.3d 882, 887 (8th Cir.2005). This is not such a case. Rather, this is a case in which the administrator's decision to deny benefits constituted an abuse of discretion. Consequently, the court will award Torgeson the LTD benefits to which she was entitled from September 19, 2003, to August 2, 2004. The precise amount of such benefits, however, is a matter that may properly be remanded for determination by the Unum, as the record currently contains no sufficient evidence to determine the amount of benefits due, and Torgeson has not argued for any specific amount of past-due benefits.[15]

### 2. Prejudgment interest

 The Eighth Circuit Court of Appeals recently explained the purposes of prejudgment interest on ERISA awards as follows:

"Prejudgment interest awards are permitted under ERISA where necessary to afford the plaintiff other appropriate

---

**15.** Although the court is authorized by § 1132(a)(1)(B) to determine a claimant's entitlement to future benefits, the court does not believe that it has been presented with a ques-

tion of Torgeson's entitlement to benefits beyond August 2, 2004. Therefore, the court awards benefits only for the closed period from September 19, 2003, to August 2, 2004.

equitable relief under section 1132(a)(3)(B)." *Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938, 945 (8th Cir.1999). While one purpose of the remedy is to compensate the prevailing party for financial damages incurred, *id.* at 946, another important purpose is to "promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation." *Stroh Container Co. v. Delphi Indus., Inc.,* 783 F.2d 743, 752 (8th Cir.), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986). "A common thread throughout the prejudgment interest cases is unjust enrichment—the wrongdoer should not be allowed to use the withheld benefits or retain interest earned on the funds during the time of the dispute." *Kerr,* 184 F.3d at 946.

*Christianson v. Poly–America, Inc., Med. Ben. Plan,* 412 F.3d 935, 941 (8th Cir. 2005). The court agrees that, where Unum improperly denied Torgeson's claim for benefits, it has been unjustly enriched by withholding benefits and retaining interest earned on funds during the time of the dispute. *Id.* Therefore, the court will award prejudgment interest on the benefits improperly withheld.

### 3. Attorney fees

 Pursuant to § 1132(g)(1), the court may, in its discretion, allow a reasonable attorney fee and costs to either party under ERISA. 29 U.S.C. § 1132(g)(1). The Eighth Circuit Court of Appeals has explained the proper purposes and pertinent factors to consider in determining whether an award of attorney fees is proper:

[T]his court has previously emphasized the role of ERISA's remedial nature in determining whether to award fees, stating:

ERISA is remedial legislation which should be liberally construed to effec-tuate Congressional intent to protect employee participants in employee benefit plans. A district court considering a motion for attorney's fees under ERISA should therefore apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts.

*Welsh v. Burlington N., Inc., Employee Benefits Plan,* 54 F.3d 1331, 1342 (8th Cir.1995) (citations, internal quotations, ellipsis, and brackets omitted). Therefore, although there is no presumption in favor of attorney fees in an ERISA action, a prevailing plaintiff rarely fails to receive fees. *See Martin v. Arkansas Blue Cross & Blue Shield,* 299 F.3d 966, 972 (8th Cir.2002) (en banc). In exercising its discretion, we have set forth the following list of five non-exclusive factors for consideration:

(1) the degree of culpability or bad faith of the opposing party; (2) the ability of the opposing party to pay attorney fees; (3) whether an award of attorney fees against the opposing party might have a future deterrent effect under similar circumstances; (4) whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of a plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* at 969 & n. 4 (citing *Lawrence,* 749 F.2d at 495–96).

*Starr v. Metro Sys., Inc.,* 461 F.3d 1036, 1040–41 (8th Cir.2006).

 In this case, the court finds that the pertinent facts weigh conclusively in favor of awarding attorney fees to Torgeson. Specifically, the court finds that Unum's conduct was not merely an abuse

of discretion, but suggested culpable or bad faith consideration of Torgeson's claim; Unum is clearly able to pay attorney fees; an award of attorney fees will have a future deterrent effect on cavalier treatment of disability claims based on conditions defined primarily by subjective symptoms and cavalier disregard of treating physicians' opinions; and Torgeson clearly had the more meritorious position. *Id.* (citing these factors as part of a non-exclusive list). The precise amount of any such award, however, must be determined in a subsequent order, after the parties have made the appropriate submissions required under applicable local rules for fee claims.

## III. CONCLUSION

Upon the foregoing, the court determines that Unum's denial of Torgeson's claim for LTD benefits under the Plan was an abuse of discretion.

THEREFORE,

1. Unum's denial of Torgeson's claim for LTD benefits is **reversed,** and Torgeson is awarded benefits due to her under the terms of the Plan for the period September 19, 2003, through August 2, 2004, pursuant to 29 U.S.C. § 1132(a)(1)(B).

2. This matter is **remanded** solely for the purpose of calculation by Unum of the benefits to which Torgeson is entitled under the Plan for the period September 19, 2003, through August 2, 2004.

3. Torgeson shall be award **prejudgment interest** on all past due benefits as further equitable relief under 29 U.S.C. § 1132(a)(3)(B).

4. Upon appropriate submissions in accordance with applicable local rules, Torgeson shall be awarded **attorney fees** pursuant to 29 U.S.C. § 1132(g)(1).

4. Torgeson's November 27, 2006, Motion For Leave To Supplement The Record (docket no. 36) is **denied as moot.**

**IT IS SO ORDERED.**